[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-13868

_____

RICHARD LEAKE,
MICHAEL DEAN,

Plaintiffs-Appellants,

*versus*

JAMES T. DRINKARD,
In his personal capacity and official capacity as
Assistant City Administrator of City of Alpharetta, Georgia,

Defendant-Appellee.

———————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:19-cv-03463-WMR

———————————————

Before WILLIAM PRYOR, Chief Judge, LAGOA, Circuit Judge, and
SCHLESINGER,* District Judge.

WILLIAM PRYOR, Chief Judge:

In *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, the Supreme Court clarified that, "[w]hen [the] government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." 576 U.S. 200, 207 (2015). Some of the Sons of Confederate Veterans did not get the message. A member, Richard Leake, applied to participate in the Old Soldiers Day Parade, a pro-American veterans parade funded and organized by the City of Alpharetta, Georgia. The City informed Leake that the Sons of Confederate Veterans would be allowed to participate, but only if it agreed not to fly the Confederate battle flag. Not content with this offer, Leake and Michael Dean, another Son, filed a civil-rights action against City officials, 42 U.S.C. § 1983, alleging that the City violated their constitutional rights to speak freely under the First and Fourteenth Amendments. The district court held that the

_____

* Honorable Harvey Schlesinger, United States District Judge for the Middle District of Florida, sitting by designation.

Parade constituted government speech and entered summary judgment against the Sons. Because governments are not obliged under the First and Fourteenth Amendments to permit the presence of a rebellious army's battle flag in the pro-veterans parades that they fund and organize, we affirm.

## I. BACKGROUND

The Old Soldiers Day Parade began after the Civil War in the City of Alpharetta to honor veterans of that war, but the Parade was discontinued after a few years. The City resumed the Parade in 1952 after a small group of residents wanted to recognize local war veterans. The City has sponsored the Parade every year since then.

The 67th Annual Old Soldiers Day Parade was held on August 3, 2019. On its website, the City promoted the Parade "as a way to celebrate and honor all war veterans, especially those from Alpharetta, who have defended the rights and freedoms enjoyed by everyone in the United States of America." "The goal of this parade," according to the City's advertisement, "is to celebrate American war veterans and recognize their service to our country." The City's advertisement identified the "City of Alpharetta and American Legion Post 201" as "hosts [of] the Annual Old Soldiers Day Parade." Although the Legion was involved, the City was the Parade's primary financial sponsor and was responsible for almost all its costs (about $28,400). By contrast, the Legion did not financially contribute any significant amount.

This controversy arose from the process for determining which private organizations would be permitted to participate in the Parade. That process began with an application. And the application identified the theme of the Parade: "*The American Legion - A Century of Service.*" The application form included logos of both the Legion and the City. It instructed applicants to mail or fax the application to the "Parade Marshal" at "American Legion Post 201 c/o City of Alpharetta Special Events" and listed government mailing and email addresses. The final decision about whether to permit an entity's participation in the Parade was made by the City based on the message the Mayor and City Council wanted the Parade to communicate. The Legion did not determine who participated in the Parade.

On the Monday after Independence Day in 2019, Richard Leake completed an application on behalf of the Roswell Mills Camp Sons of Confederate Veterans, of which he is a member. The application asked for a detailed description of the Sons of Confederate Veterans's float. Leake wrote that there would be a "[t]ruck pulling trailer with participants holding unit flags." The application also asked applicants to "write a description of what you would like to say about your group or organization as you pass the Reviewing Stand." Leake wrote that they would say that the Sons of Confederate Veterans is an "organization dedicated to preserving the memory of our ancestors who served in the War Between the States and ensuring that the Southern view of that conflict is preserved." The application required that the Sons of Confederate

Veterans agree to "abide by all rules and regulations set forth by the event organizers[, the City of Alpharetta and the American Legion Post 201,] in the Old Soldiers Day Parade." Leake signed the application.

The following day, James Drinkard, the Assistant City Administrator, sent a letter to Leake in response to his application. The letter was sent "following approval from Mayor Gilvin." In the letter, Drinkard reiterated that the purpose of the Parade is to "unite our community" to "celebrat[e] American war veterans," and that, in the light of that purpose, "there is cause to question the appropriateness of participation by an organization devoted exclusively to commemorating and honoring Confederate soldiers." (Internal quotation marks omitted.)

Drinkard's letter stated "that the Confederate Battle Flag has become a divisive symbol that a large portion of our citizens see as symbolizing oppression and slavery." In the City's view, that divisiveness would draw "the spotlight away from the goals of the . . . Parade and the service of our *American* war veterans." (Emphasis added.) The letter continued, "the City of Alpharetta will maintain its decision, supported unanimously by Mayor Gilvin and the City Council, to not allow the Confederate Battle Flag to be flown in the Old Soldiers Day Parade."

The City offered to allow the Sons of Confederate Veterans to participate in the Parade "absent the Confederate Battle Flag." The Sons of Confederate Veterans would also have to agree not to do anything "that would detract from the event goal of uniting our

community for the purpose of celebrating American war veterans." Drinkard informed Leake that "the City of Alpharetta [would] approve [his] application" if he were to agree to these conditions.

Three days before the Parade, Leake and Dean sued Drinkard and other City officials, including Mayor Gilvin, for violating their right to free speech under the First and Fourteenth Amendments. The Sons sought monetary damages for the violation of their rights, as well as equitable relief in the form of a temporary restraining order, a preliminary injunction, and a permanent injunction, so that they could participate with the Confederate battle flag in the upcoming Parade and in future ones. *See* 42 U.S.C. § 1983. On the day before the Parade, the district court reserved ruling on the motion for a temporary restraining order and declined to issue an injunction. The Parade went ahead as planned, without the participation of the Sons of Confederate Veterans, whose sympathizers instead flew the Confederate battle flag along the side of the Parade route.

Later that year, the Mayor and City Council formally resolved "that the City of Alpharetta shall no longer sponsor or financially support future Old Soldiers Day Parades." The City then moved for summary judgment, arguing that the Parade constituted government speech and that the claim for injunctive relief was now moot because of the City's formal resolution to discontinue its sponsorship of the Parade in the future. The district court later granted summary judgment for the City on the ground that the Parade constituted government speech.

## II. STANDARD OF REVIEW

"We review a summary judgment *de novo*." *Mech v. Sch. Bd.*, 806 F.3d 1070, 1074 (11th Cir. 2015) (internal quotations marks omitted). Summary judgment is appropriate in this case if, after viewing the record in the light most favorable to the Sons, *id.*, "there is no genuine dispute as to any material fact" such that the City "is entitled to judgment as a matter of law," FED. R. CIV. P. 56(a).

## III. DISCUSSION

For the Sons to prevail in this civil-rights action, 42 U.S.C. § 1983, they must show that they were "deprived of a federal right by a person acting under color of state law." *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001). The City admits that it acted under color of state law when it prohibited the Sons from displaying the Confederate battle flag at the Parade. The parties dispute whether the City deprived the Sons of their right to speak freely under the First and Fourteenth Amendments. The City argues that there was no deprivation because the Parade constituted the City's speech; the Sons argue the contrary. We agree with the City.

The First Amendment provides in relevant part that "Congress shall make no law . . . abridging the freedom of speech." U.S. CONST. AMEND. I. This "personal" right is now protected against State abridgment by the Fourteenth Amendment. *Gitlow v. New*

*York*, 268 U.S. 652, 666 (1925). But whether that personal right has been abridged depends crucially on whose speech is at issue.

The First Amendment works as a shield to protect *private* persons from "encroachment[s] by the government" on their right to speak freely, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 566 (1995), not as a sword to compel the government to speak for them. In other words, "[t]he Free Speech Clause of the First Amendment 'restricts government regulation of private speech; it does not regulate government speech.'" *Mech*, 806 F.3d at 1074 (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009)). That is, "[a] government entity has the right to speak for itself," which consists generally in the ability "to say what it wishes" and "to select the views that it wants to express." *Summum*, 555 U.S. at 467–68 (internal quotation marks omitted).

When the government speaks, it may refuse to endorse or freely remove speech of which it disapproves. *Mech*, 806 F.3d at 1074. And "[p]arades are . . . a form of expression" that involve "marching to make a point." *Hurley*, 515 U.S. at 568. It follows that, if the Parade was the City's speech, the City was free to condition the Sons' participation in the Parade on their not displaying the Confederate battle flag; the Sons' "case could not [then] proceed under the Free Speech Clause." *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n*, 942 F.3d 1215, 1230 (11th Cir. 2019). In a word, if the Parade was government speech, the Sons lose. *Mech*, 806 F.3d at 1074.

20-13868                Opinion of the Court                    9

What makes speech *government* speech? Although we lack a "precise test," *id.*, there are three factors we use to distinguish government speech from private speech: history, endorsement, and control, *Cambridge*, 942 F.3d at 1230. "The first factor—history—directs us to ask whether the type of speech under scrutiny has traditionally 'communicated messages' on behalf of the government." *Id.* at 1232 (quoting *Walker*, 576 U.S. at 211). The second factor—endorsement—asks whether "observers reasonably believe the government has endorsed the message." *Mech*, 806 F.3d at 1076. "Finally, the control factor asks whether the relevant government unit 'maintains direct control over the messages conveyed' through the speech in question." *Cambridge*, 942 F.3d at 1234 (quoting *Walker*, 576 U.S. at 213).

These factors are neither individually nor jointly necessary for speech to constitute government speech. *See Mech*, 806 F.3d at 1075–76. But a finding that *all* evidence government speech will almost always result in a finding that the speech is that of the government. *See, e.g.*, *Walker*, 576 U.S. at 210–14; *Dean v. Warren*, No. 19-14674, slip op. at 33–38 (11th Cir. 2021). And all three factors support the City's position that the Parade constituted its speech.

## A. History

The history of military parades in general, and this Parade in particular, weighs in favor of finding that the Parade was government speech. Just as "[g]overnments have long used monuments to speak to the public" and "commemorate military victories and sacrifices," *Summum*, 555 U.S. at 470, so too governments of all

kinds have from time immemorial used parades to communicate the same kinds of messages. Examples are legion. Take one: The Roman triumphs were "famous parades through the city of Rome that celebrated Rome's greatest victories against its enemies." MARY BEARD, THE ROMAN TRIUMPH 1 (2009). And they also involved celebrating war veterans. *Id.* ("To be awarded a triumph was the most outstanding honor a Roman general could hope for.").

Since then, governments, up to and including the United States, have used triumph parades to celebrate their militaries. For example, in 1899 "the victories of Admiral George Dewey in the Spanish-American War were celebrated with a triumphal parade in New York" and "a special triumphal arch was built . . . at Madison Square." *Id.* at 2. So the particular medium of communication at issue here—a parade—is one that, since "ancient times," *Summum*, 555 U.S. at 470, "has traditionally 'communicated messages' on behalf of the government," *Cambridge*, 942 F.3d at 1232 (quoting *Walker*, 576 U.S. at 211). And the "kind of speech" conveyed through that medium—celebration of the military—is one that was "often closely identified in the public mind with the government." *Id.* (internal quotation marks omitted).

The history of this Parade especially fits within the general history of government-sponsored parades. The City has sponsored the Parade every year since 1952. The Parade's central purpose was to honor and celebrate American war veterans. The 2019 Parade's purpose and message were the same. And the City remained its

only significant financial sponsor. So history establishes both that the medium used here and the message conveyed through it are ones traditionally associated with governments. It follows that this factor favors the City. *See Mech*, 806 F.3d at 1075–76 ("A medium that has long communicated government messages is more likely to be government speech . . . .").

## B. Endorsement

The City expressly "endorsed the [Parade's] message," which "strongly suggests that the [Parade] [is] government speech." *Id.* at 1076. The City publicly advertised and promoted the 2019 Parade on its website, where it identified itself and the Legion as co-hosts. The City publicly identified the "goal of th[e] parade" as the celebration of "American war veterans" and the recognition of "their service to our country." The City publicly endorsed the sentiment that "all war veterans, especially those from Alpharetta" should be "celebrate[d] and honor[ed]." And the City publicly advertised that the Parade would open with a performance by the City Band. "[O]bservers [would have] reasonably believe[d] the government ha[d] endorsed the [Parade's] message" because the City expressly and publicly did so. *Mech*, 806 F.3d at 1076; *see also Dean*, No. 19-14674, slip op. at 35 (concluding that "there is no doubt that Kennesaw State University endorses the message conveyed by its cheerleading team" because of express statements on the athletics department's website evidencing that cheerleaders "are expected to convey a message of which the university approves").

The Legion's involvement does not undermine this conclusion. To be sure, Drinkard asserted in an email that the Parade "is largely viewed as the Legion's event." But he admitted in the same sentence that "the event is put on as a *partnership* between the American Legion and the City." (Emphasis added.) That partnership was a matter of public knowledge. And a partnership "suggests that the [Legion] has a close relationship with the [City]—*i.e.*, that the [Legion] is an 'associate' or is 'engaged together in the same activity.'" *Mech*, 806 F.3d at 1076 (quoting *Partner*, Oxford English Dictionary (online ed.)). So both the City and the Legion publicly came together to endorse the *same* message. Indeed, "partnership" is an understatement. Although the Legion was publicly identified as a *co*-host of the Parade, it did not financially contribute to it in any significant amount. The City, by contrast, covered almost all the Parade costs, including those associated with the event space, public safety personnel, barricades, and vendors to service the Parade.

The Sons contend that the Parade's being "sponsored with both private and public money" is sufficient to make it private speech and that "the City is using its position as a majority-sponsor of the parade to regulate private speech." But neither the Legion's involvement nor the involvement of private organizations as participants in the Parade itself establish that the City did not endorse the messages communicated by the Parade. "The fact that private parties take part in the design and propagation of a message does not extinguish the governmental nature of the message," *Walker*,

576 U.S. at 217, especially if, as here, the government is organizing and funding the event through which the message is communicated. Cities "typically do not" organize and fund events that contain "messages with which they do not wish to be associated." *Id.* at 212 (alteration adopted) (internal quotation marks omitted). And "because [the speech] occurs at a government-organized event" in the form of the Parade, "we can safely assume that the organizers . . . generally would not allow . . . messages they did[ not] want to be associated with." *Cambridge*, 942 F.3d at 1233. It is obvious, then, that observers would interpret a parade promoted, organized, and funded by the government "as conveying some message on [its] behalf." *Walker*, 576 U.S. at 212 (internal quotation marks omitted).

## C. Control

The final factor—control—strongly supports that the Parade was the City's speech. The evidence establishes that the City "maintains direct control over the messages conveyed" in the Parade. *Id.* at 213. Participation in the Parade depended on submission of an application to the City. The application expressly required applicants to describe the kinds of messages they intended to convey at the Parade. "[F]inal approval authority" over the application was exercised by the City based on the message the Mayor and City Council wanted the Parade to communicate. *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 561 (2005); *see also Mech*, 806 F.3d at 1078 (holding that the control factor "strongly suggests that the banners are government speech" because school principals

were obliged to approve every banner before they were placed on school fences). The Legion, by contrast, did not determine who participated in the Parade.

All these facts establish that the control factor weighs in the City's favor. The City "effectively controlled the messages conveyed" by requiring applicants to describe the messages they intended to communicate and then by "exercising final approval authority over their selection" based on those descriptions. *Walker*, 576 U.S. at 213 (alterations adopted) (internal quotation marks omitted). When the City exercised this control as the Parade's organizer by excluding organizations with whose speech the City disagreed, the City was speaking. *See Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 64 (2006) ("[A] parade organizer's choice of parade contingents . . . is . . . inherently expressive.").

To be sure, once an applicant is admitted, it may renege on its express promise on the application form to "abide by all rules and regulations set forth by the event organizers." But the government need not "control every word or aspect of speech in order for the control factor to lean toward government speech." *Cambridge*, 942 F.3d at 1235–36. If the reverse were true, any speech through private parties would involve yielding control. The government-speech doctrine does not require omnipotence. *See id.* ("[C]omplete control is not required."). And, as we have repeatedly stressed, the City was free "to express its views" by receiving "assistance from private sources for the purpose of delivering a government-controlled message." *Summum*, 555 U.S. at 468. The City

decided which private groups to admit or exclude based on the consistency of the groups' characterizations of their intended speech on the City's application form with the messages the City wanted to communicate through the Parade. And the City required that participants agree in advance to abide by "all rules and regulations" that the City imposed. Either exclusion or advance preconditions would be adequate control. Because all three factors point in the same direction, we conclude that the Parade was the City's speech.

*Matal v. Tam*, 137 S. Ct. 1744 (2017), is not to the contrary. In *Matal*, the Supreme Court held that the content of registered trademarks is not government speech in part because the government would then be "babbling prodigiously and incoherently," expressing at once "contradictory views." *Id.* at 1758. The Sons rely heavily on this reasoning. They argue that, if the Parade were the City's speech and the Sons participated even without displaying the Confederate battle flag, the City would be expressing contradictory views by "simultaneously endors[ing] opposing sides of the same wars, such as the Union and the Confederacy."

There is nothing to this argument. *Matal*'s reasoning about contradictory speech followed *other* considerations in the light of which the Court concluded that "it is far-fetched to suggest that the content of a registered mark is government speech." *Id.* The Court explained that the government "does not edit marks submitted for registration"; "an examiner may not reject a mark based on the viewpoint that it appears to express" (save the exception at issue in that case); "an examiner does not inquire whether any viewpoint

conveyed by a mark is consistent with Government policy"; if the mark meets viewpoint-neutral requirements, "registration is mandatory"; and the placement of the mark on the principal register is ordinarily not reviewed by any official higher than the examiner. *Id.* The opposite facts exist in this case: The City asked for a detailed description of the intended speech so that it could "edit" the speech. The City exercised the discretion to reject any organization based on whether the viewpoint it intended to express was consistent with the City's views. And the ultimate decision was made by the highest City authorities. This appeal is not *Matal*.

In any event, "[e]ven if we agreed that the protection of the government-speech doctrine must be forfeited whenever there is inconsistency in the message, we would nonetheless accord the protection here" because the City's message was consistent. *Johanns*, 544 U.S. at 561 n.5. The fallacy in the Sons' argument is the implicit assumption that *all* views associated with *all* participants would be the City's speech if the Parade were the City's speech. But that assumption is false. "By accepting" a float, the City "does not necessarily endorse the specific meaning that any particular donor sees in" it. *Summum*, 555 U.S. at 476–77.

Consider an example on which the Sons rely: The City allowed the "Democrat Party of Fulton County [to] participate." In the light of the Parade's central message—honoring veterans—observers could reasonably infer from their participation not that the City endorsed everything for which the Democrats stand, but that the City has brought together diverse "private parties" to

"propagat[e]" one common message with which all participating parties agreed. *Walker*, 576 U.S. at 217. And one could reasonably infer that there was nothing on the Democratic Party's float that the City thought was incompatible with the values it was seeking to promote through the Parade. *See Hurley*, 515 U.S. at 574 ("Rather like a composer, the [organizer] selects the expressive units of the parade from potential participants, and though the score may not produce a particularized message, each contingent's expression in the [organizer's] eyes comports with what merits celebration on that day.").

Far from communicating an inconsistent message, the City sought to keep its message *consistent* by excluding the Confederate battle flag. As Drinkard explained to Leake, the City's view was that the Confederate battle flag symbolizes oppression and slavery, and its inclusion was inconsistent with its goal of uniting the community. The public purpose of the Parade was to celebrate the service of veterans who "defended the rights and freedoms enjoyed by *everyone*." (Emphasis added.) The City was free to exercise its right to exclude the Confederate battle flag from its Parade on those bases or any others. *See Walker*, 576 U.S. at 206 (upholding Texas's decision to exclude the Confederate battle flag from its license plates based on Texas's determination that "a significant portion of the public associate the confederate flag with organizations advocating expressions of hate" (internal quotation marks omitted)).

Finally, "[a]bsurd results would follow if the First Amendment protected" the Sons' right to fly the Confederate battle flag in

the City-organized Parade. *Dean*, No. 19-14674, slip op. at 37. By the Sons' logic, anytime the government seeks to organize an event by bringing private parties together to communicate a message the government wants expressed, it must allow the participation of other parties that will express the *opposite* message. For example, if after ratification of the Bill of Rights the federal government funded and organized a parade commemorating our stunning victory over Great Britain, it would have had to allow participation of Union Jack-waving loyalists if it allowed participation of Gadsden flag-waving patriots. The Constitution does not require such an absurdity. *See Summum*, 555 U.S. at 480 (rejecting the proposition that "[e]very jurisdiction that has accepted a donated war memorial may be asked to provide equal treatment for a donated monument questioning the cause for which the veterans fought"); *see also People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 30 (D.C. Cir. 2005) ("No one could plausibly argue that an Inauguration Parade has to have balance, or that the losing Presidential candidate must—if he requests—be allowed to have a float of his own."). And with good reason: It "would lead almost inexorably to" the end of government-sponsored parades, a medium of communication governments have used from time immemorial. *Summum*, 555 U.S. at 480.

The three-factor analysis establishes that, when governments organize and sponsor a parade to communicate a message, the parade is their speech from which they may include or exclude participants at will. "Since every participating unit affects the

message conveyed by the . . . organizers" of a parade, neither the government nor private parties may compel them "to alter the expressive content of their parade." *Hurley*, 515 U.S. at 572–73. This principle applies no matter whether the organizer is the government or a private party. A government cannot compel a private parade organizer to admit groups of whose views the private organizer disapproves. *Id.* at 574–75 (holding that the State could not compel a private parade organizer to admit a gay, lesbian, and bisexual advocacy group because the "parade's organizers" had a right to choose not "to propound a particular point of view"). And we hold that a private organization cannot compel a government parade organizer to admit groups of whose views the government disapproves.

"To the [Sons of Confederate Veterans], [the Confederate battle flag] is said to evoke the memory of their ancestors and other soldiers who fought for the South in the Civil War." *Walker*, 576 U.S. at 234 (Alito, J., dissenting). But to many others, "it symbolizes slavery, segregation, and hatred." *Id.* That sentiment is not surprising.

Southern governments began prominently displaying the Confederate battle flag, not soon after their defeat by the United States in 1865, but in the 1950s and 1960s "in symbolic defiance of changing laws that threatened" state-compelled racial segregation. *Moore v. Bryant*, 205 F. Supp. 3d 834, 843 (S.D. Miss. 2016). "In early 1948, as President Truman pressed for Civil Rights legislation, some Southern Democrats called for an anti-Truman,

segregationist electoral bloc in the South." Chris Springer, *The Troubled Resurgence of the Confederate Flag*, 43 HIST. TODAY, no. 6, June 1993, at 7, 8. Segregationist Democrats "appropriated the Confederate flag as their symbol" and "[f]or their political and racial revolt" against federal civil-rights legislation, "they mustered behind them all the iconography of the Confederacy." *Id.* "In 1956, Georgia redesigned its flag to include the Confederate battle emblem," and both South Carolina and Alabama raised the flag at their state capitols in 1962 and 1963, respectively, at the height of their attempts to preserve the institution of racial segregation. *Moore*, 205 F. Supp. at 843–44. As a result, "the Dixiecrat campaign greatly strengthened the links between the flag and white supremacism." Springer, *supra*, at 8.

The City recognized the obvious fact that the flag "has become a divisive symbol that a large portion of our citizens see as symbolizing oppression and slavery." Although Southern governments once flew the flag to promote those unjust causes, they cannot now be *compelled* to do so by private parties when they have made the decision to promote just causes instead. We hold that the Parade was the City's speech. It follows that the Sons of Confederate Veterans "cannot force [the City] to include a Confederate battle flag" in the veterans parades it funds and organizes. *Walker*, 576 U.S. at 219.

## IV. CONCLUSION

We **AFFIRM** the judgment in favor of the City.