[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-12863

_____

JARED MCGRIFF,
OCTAVIA YEARWOOD,
RODNEY JACKSON,
NAIOMY GUERRERO,

                                        Plaintiffs-Appellants,

*versus*

CITY OF MIAMI BEACH,

                                        Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

D.C. Docket No. 1:20-cv-22583-MGC

———————————————

Before JORDAN, ROSENBAUM, and HULL, Circuit Judges.

HULL, Circuit Judge:

Artists Jared McGriff, Octavia Yearwood, Rodney Jackson, and Naiomy Guerrero (collectively "plaintiffs") appeal the district court's entry of summary judgment in favor of the City of Miami Beach on their First Amendment claim brought against the City under 42 U.S.C. § 1983. The City contracted with the artists to create and curate a series of artworks that the City would own. The district court entered summary judgment after finding that the City's removal of one piece of plaintiffs' artwork constituted government speech and was immune from First Amendment scrutiny under *Pleasant Grove v. Summum*, 555 U.S. 460 (2009) and *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015). After review and with the benefit of oral argument, we agree and affirm the summary judgment under the particular factual circumstances of this case.

## I.    FACTS AND PROCEDURAL HISTORY

The City of Miami Beach has a troubling and regrettable history of race relations. In hopes of "sparking crucial conversations about inclusion, blackness, and relationships," the City organized an event called "ReFrame: Miami Beach" ("ReFrame"), which included a series of art installations to be displayed on Memorial Day Weekend 2019. The City signed

Professional Services Agreements ("the Agreements") with plaintiffs McGriff's and Yearwood's production companies to, among other things, curate an installation called *I See You, Too.*[1] In relevant part, the Agreements provided:

- "All installations shall be subject to review and approval by the City Manager's designee";

- "[A]ll services provided by the [production companies] shall be performed . . . to the reasonable satisfaction of the City Manager";

- "Any work product arising out of th[e] Agreement[s], as well as all information specifications, processes, data and findings, are intended to be the property of the City and shall not otherwise be made public and/or disseminated by [the production companies], without the prior written consent of the City Manager . . ."; and

- "[T]he City will provide [the production companies] with the appropriate location to perform the services . . . ."

(Font altered.)

---

[1] The City Manager originally contracted with a different production company to produce the cultural programming for its Memorial Day Weekend event, but he fired that company because he did not approve of its programming decisions.

In preparation for ReFrame, the City distributed a press release on City letterhead and flyers that marketed the event. The press release and flyers included the City's e-mail addresses, characterized ReFrame as the City's inaugural festival, and advertised the *I See You, Too* installation. The press release and a letter written by the City Manager to the Mayor and City Commission confirmed that the programming was intended to broach the topics of "inclusion, blackness, and relationships." The City also contracted to provide the exhibition venue space for the *I See You, Too* installation, and the City organized and advertised an opening night cocktail reception and media preview. The City's Mayor was interviewed on National Public Radio ("NPR") with Yearwood about the event.

Among other artworks exhibited at the *I See You, Too* installation was a painting of a Haitian-American man named Raymond Herisse. A written narration accompanied the painting, explaining how Miami Beach police officers shot and killed Herisse during the 2011 Memorial Day Weekend. After viewing the painting, the City Manager told the artists to remove the Herisse memorial from the exhibition. He later explained to the Mayor and City Commission that the painting was "potentially divisive and definitely insulting to our police as depicted and narrated."

In response, plaintiffs brought this action against the City, alleging that it violated their First Amendment free speech rights by having the Herisse painting removed from the *I See You, Too*

installation.[2]   The City filed a motion for summary judgment, arguing that plaintiffs' claim did not implicate the First Amendment under the government speech doctrine.  The district court agreed, finding that three factors used to identify government speech—control, history, and endorsement— weighed in favor of the City.

## II.    STANDARD OF REVIEW

We review the district court's grant of summary judgment *de novo* and "may affirm based on any ground supported by the record." *Fuqua v. Turner*, 996 F.3d 1140, 1149, 1156 (11th Cir. 2021). Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

## III.    THE GOVERNMENT SPEECH DOCTRINE

"[T]he Government's own speech . . . is exempt from First Amendment scrutiny."  *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005).  Thus, when the government speaks, it is free to choose what to say and what not to say.  *Walker*, 576 U.S. at 207; *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995) ("[W]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes.").  "This freedom includes choosing not to speak and

---

[2] Plaintiffs also named the City Manager and the Mayor as individual defendants.  However, the district court dismissed them from this case after determining that they were entitled to qualified immunity, which plaintiffs do not challenge on appeal.

speaking through the removal of speech that the government disapproves." *Mech v. Sch. Bd.*, 806 F.3d 1070, 1074 (11th Cir. 2015) (cleaned up). The government "may exercise this same freedom . . . when it receives assistance from private sources for the purpose of delivering a government-controlled message." *Summum*, 555 U.S. at 468. "The fact that private parties take part in the design and propagation of a message does not extinguish its governmental nature." *Mech*, 806 F.3d at 1078 (cleaned up).

In deciding whether expression is government speech or private speech, we may consider several factors. *See Summum*, 555 U.S. at 470–72; *Walker*, 576 U.S. at 209–213. For example, we may ask: (1) whether the government maintains control over the speech; (2) whether the type of speech has traditionally communicated government messages; and (3) whether the public would reasonably believe that the government has endorsed the speech. *See, e.g.*, *Leake v. Drinkard*, 14 F.4th 1242, 1248 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 1443 (2022). But "we lack a 'precise test,'" and "[t]hese factors are neither individually nor jointly necessary for speech to constitute government speech." *Id.*; *see also Mech*, 806 F.3d at 1075 (stating that these factors are not "exhaustive" and will not "be relevant in every case"). "Our review is not mechanical; it is driven by a case's context rather than the rote application of rigid factors." *Shurtleff v. City of Boston*, 596 U.S. ----, 142 S. Ct. 1583, 1589 (2022).

### IV.    THE CITY ENGAGED IN GOVERNMENT SPEECH

Considering the totality of the circumstances here, we agree with the district court and hold there is no genuine dispute of material fact that the City was speaking when it selected some artwork, but not others, to display at ReFrame.  We reject plaintiffs' arguments that the district court misinterpreted the scope of the control and history factors and that the City's actions were insufficient to show its endorsement of ReFrame's message.

### A. Control

The City controlled the *I See You, Too* installation and the Herisse painting because it contracted to commission and fund the artists' work; to control its exhibition, including by subjecting the art to the City Manager's approval; and to provide the space in which the exhibition was housed.  *See Gundy v. City of Jacksonville Fla.*, 50 F.4th 60, 79 (11th Cir. 2022), *cert. denied.* 143 S. Ct. 790 (2023) (holding the City Council's invocation was government speech where the City Council organized the invocation, provided the venue for the invocation, and selected the speaker).

Moreover, the Agreements provided that the City owned the artwork produced for ReFrame, which includes the Herisse painting.  After the City "took ownership" of the artwork pursuant to the Agreements, "[a]ll rights previously possessed by the [production companies were] relinquished." *See Summum*, 555 U.S. at 473–74.  Having bought the artwork, the City's decision to display it, or not display it, was classic government speech.  The Agreements even provided that the artwork "shall not otherwise

be made public and/or disseminated by [the production companies], without the prior written consent of the City Manager." *See id.* at 470 (calling it an "obvious proposition that a monument that is commissioned and financed by a government body for placement on public land constitutes government speech"); *see also Serra v. U.S. Gen. Servs. Admin.*, 847 F.2d 1045, 1049 (2d Cir. 1988) ("Serra relinquished his own speech rights in the sculpture when he voluntarily sold it to GSA; if he wished to retain some degree of control as to . . . the display of his work, he had the opportunity to bargain for such rights in making the contract for sale of his work."); *Raven v. Sajet*, 334 F. Supp. 3d 22, 28, 32 (D.D.C. 2018) (holding that, because the Smithsonian Institution's "art selection decisions constitute government speech," the gallery director's rejection of a painting on the ground that it was "too Pro-Trump" did not violate the First Amendment (quotation marks omitted)); *Newton v. LePage*, 849 F. Supp. 2d 82, 124 (D. Me. 2012) ("[I]f a private artist retains a degree of First Amendment control over her artwork even after she sells it, the Government will be unable to control its own art. This result is contrary to [the Supreme Court's decision in] *Summum* . . . ."), *aff'd*, 700 F.3d 595 (1st Cir. 2012).

Plaintiffs argue that the district court misinterpreted the scope of the control factor by not requiring the City to have actively controlled the message of the artwork they produced. Plaintiffs rely on *Shurtleff*, a case in which the Supreme Court held that "Boston's come-one-come-all attitude" regarding applications for private flags to be flown outside city hall showed that it lacked

control over the messages conveyed by those flags.  *See Shurtleff*, 142 S. Ct. at 1592.  However, the Supreme Court directly compared Boston's lack of control with *Summum*, where the city selected and took ownership over donated monuments to be placed in a public park.  *Id.* at 1592-93.

Here, it is undisputed that the City contracted with the production companies to: (1) fund and take ownership over the art, (2) control how the art was to be disseminated, and (3) subject the art to the reasonable satisfaction of the City Manager, who determined that the Herisse painting should be removed because he believed it to be "potentially divisive."  Recount that a City press release and a letter from the City Manager to the Mayor and City Commission stated that one theme for ReFrame was "inclusion."  Additionally, prior to the Agreement, the City Manager terminated a contract with a different production company after disagreeing with its programming decisions for the Memorial Day Weekend event.  *See Gundy*, 50 F.4th at 80 ("[W]hile the City Council did not purport to have initial editorial rights over the exact content of the invocations, selecting one speaker over another exhibits control.").  The City's actions mirror—and arguably exceed—those taken in *Summum*, and they show that the City sufficiently controlled the message of ReFrame.

## B.  History

Turning to the history factor, we ask whether the type of speech has traditionally communicated government messages.  *See*

*Leake*, 14 F.4th at 1248. Plaintiffs argue that "artistic expression"[3] is the type of speech at issue here and concede that it "has *sometimes* been used to convey government speech." However, they suggest that the history factor requires *the majority* of the historical use of a type of speech to have been by the government, as opposed to by private individuals. But neither we nor the Supreme Court have characterized this factor so restrictively. *See, e.g.*, *Walker*, 576 U.S. at 211 (noting that license plates "long have communicated messages from the States"); *Matal v. Tam*, 582 U.S. 218, 234-35, 238 (2017) (comparing trademarks, which "have not traditionally been used to convey a Government message," with posters used during the Second World War to promote the war effort); *Mech*, 806 F.3d at 1076 (stating that "we would have little difficulty" classifying a Facebook message from a school board about school closings as

---

[3] Notably, plaintiffs' framing of the medium of speech here as "artistic expression" seems far too broad. In *Summum*, for example, the Supreme Court held that the history factor weighed in favor of the government because "Governments have long used monuments to speak to the public," and "throughout our Nation's history, the general government practice with respect to donated monuments has been one of selective receptivity." *Summum*, 555 U.S. at 470-71. If plaintiffs' characterization of the speech here were correct, their position would be wholly inconsistent with *Summum*, as artistic expression is present in both commissioned paintings and donated monuments. But neither party raises the issue of how to properly characterize the speech at issue here, so we need not address it. *See United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022) (en banc) (stating that, in our adversarial system of adjudication, "we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present" (quotation marks omitted)).

government speech, even though social media is a relatively new phenomenon). Even assuming, as plaintiffs contend, that artistic expression has historically been used for private speech more often than government speech, this does not negate the government's own long historical use of artistic expression to convey messages. The history factor does not require the government to show that it historically commissioned more artwork than private individuals and institutions. We conclude this factor also weighs in the City's favor.

## C. Endorsement

In *Leake*, we stated that "observers would interpret a parade promoted, organized, and funded by the government as conveying some message on [its] behalf," as "[c]ities typically do not organize and fund events that contain messages with which they do not wish to be associated." *Leake*, 14 F.4th at 1250 (quotation marks omitted). Here, the public would reasonably believe that the City endorsed the art produced for ReFrame because it: (1) publicized ReFrame, including the *I See You, Too* installation in particular, in City press releases and flyers; (2) organized and advertised an opening night cocktail reception and media preview; and (3) had its Mayor interview with Yearwood—a co-curator for the *I See You, Too* installation—on NPR. And even if these actions were somehow not enough to show that the City endorsed the message of ReFrame and of the *I See You, Too* installation, this factor need not weigh in the City's favor for us to conclude that the speech involved here was government speech. *See Leake*, 14 F.4th at 1248.

## V.    CONCLUSION

Just as "governments are not obliged under the First and Fourteenth Amendments to permit the presence of a rebellious army's battle flag in the pro-veterans parades that they fund and organize," *Leake*, 14 F.4th at 1245; *see also Walker*, 576 U.S. at 219, they are not obliged to display any particular artwork in the art exhibitions that they fund, organize, and promote.

The district court is **AFFIRMED**.

22-12863        Jordan, J., Concurring in the judgment                    1

JORDAN, Circuit Judge, Concurring in the judgment.

I join Judge Hull's opinion for the court in full, and write separately to make a number of points.

First, we are resolving First Amendment claims concerning the City of Miami Beach's decision to not display Rodney Jackson's painting of Raymond Herisse and its accompanying written narrative, which together constitute a visual work of art. Our decision it seems to me, is not complete without a reproduction of the painting and the narrative. I therefore attach a color copy of the painting as an appendix and reproduce the narrative below.[1]

---

[1] The narrative was as follows:

Ha[i]tian-American Raymond Herisse was 22 years old when he was shot to death by Miami Beach and Hialeah police officers on Collins Avenue during Urban Beach Week in 201[1]. 116 shots were fired by the police, four bystanders were wounded, and 12 police officers participated in the shooting.

Police suggested Herisse was firing a gun from his vehicle, gunshot residue tests released years later proved Herisse never fired a weapon that day. An examination of the record by The Miami Herald found the police narrative inconsistent, contradictory, and missing key information. His shooting changed the way Miami Beach police now interact with motorists, as now they cannot shoot into a moving vehicle unless someone inside the vehicle displays a weapon or fires first. This memorial is to honor Herisse, to affirm #blacklivesmatter and call into question the excessive force, racial discrimination, violence, and aggression often present in interactions between police and unarmed black civilians.

2                    Jordan, J., Concurring in the judgment        22-12863

As the court explains, the City's decision to remove the painting and narrative from the exhibition did not violate the First Amendment. That is because, on this record, the removal of the artwork owned by the City constituted government speech. *See, e.g., People for the Ethical Treatment of Animals, Inc. v. Gittens,* 414 F.3d 23, 28 (D.C. Cir. 2005) (addressing a First Amendment challenge to the D.C. Commission's decision as to which decorated elephants and donkeys to display after paying for them and obtaining ownership of them: "In the case before us, the Commission spoke when it determined which elephant and donkey models to include in the exhibition and which not to include. In using its 'editorial discretion in the selection and presentation of' the elephants and donkeys, the Commission thus 'engage[d] in speech activity'[.]") (citation omitted).[2]

But that does not absolve Miami Beach from criticism from its decision. The painting, as least to my eyes, is an unoffending tribute to a man who was shot and killed by Miami Beach police officers. As for the narrative, the first paragraph contains undisputed facts, and the second paragraph seems accurate: the police suggested that Mr. Herisse had a gun while in his vehicle; the gunshot residue tests showed that Mr. Herisse did not fire the gun

---

*McGriff v. City of Miami Beach*, 522 F.Supp.3d 1225, 1237 (S.D. Fla. 2020) (order on motions to dismiss).

[2] The analysis would be different if the City did not own the Herisse painting and nevertheless acted to remove it from display (or prevent it from being displayed) on private property. *See, e.g., Nelson v. Streeter*, 16 F.3d 145, 147–49 (7th Cir. 1994).

22-12863      Jordan, J., Concurring in the judgment             3

found three days later beneath the driver's seat; an investigation by *The Miami Herald* found inconsistencies in the police narrative; and as a result of the shooting of Mr. Herisse the City changed its use of deadly force policy with respect to shooting into vehicles. *See generally* Julie K. Brown, "The Killing of Raymond Herisse: 116 Shots that Shook South Beach; Miami Beach," *The Miami Herald*, May 25, 2013; Lizette Alvarez, "2 Years After 116 Police Bullets Flew Few Answers," *The New York Times*, Aug. 3, 2013; Alexi C. Cardona, Joshua Ceballos, and Jessica Lipscomb, "Here Are Six of Rundle's Most Controversial Cases," *Miami New Times*, Aug. 11, 2020.

Second, at oral argument the plaintiffs likened this case to *Brooklyn Inst. of Arts & Scis. v. City of New York*, 64 F. Supp. 2d 184 (E.D.N.Y. 1999). There, a district court issued a preliminary injunction prohibiting New York City and its Mayor from withholding funding for the Brooklyn Museum in retaliation for displaying an exhibit that, in the Mayor's words, "desecrate[d] someone else's religion." *Id*. at 191, 205. One such exhibit, a painting titled "The Holy Virgin Mary," contained "elephant dung" and provocative images. *See id*. at 191.

Three important distinctions make the Brooklyn Museum case inapposite here. First, New York City did not own the Brooklyn Museum's collections. *See id*. at 188 ("The Contract is unequivocal that the City has no ownership rights with respect to any of the collections in the Museum."). Second, under the governing contract New York City had no editorial control over the Brooklyn Museum's decisions as to what art to display. *See id*. at 204 ("There

is also no language in the Lease or Contract that gives the Mayor or the City the right to veto works chosen for exhibition by the Museum.").  Third, the government action at issue in the Brooklyn Museum case was the withdrawal of funding and not—as here—a decision by the City of Miami Beach to not display a painting that it owned and over which it had full editorial control.

22-12863    Jordan, J., Concurring in the judgment    5

**Appendix**

