[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-11222

_____

CAMBRIDGE CHRISTIAN SCHOOL, INC.,

Plaintiff-Appellant,

*versus*

FLORIDA HIGH SCHOOL ATHLETIC
ASSOCIATION, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:16-cv-02753-CEH-AAS

_____

Before GRANT, TJOFLAT, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

The Florida High School Athletic Association (FHSAA) is a state actor with statutory authority to govern some aspects of high school athletics in Florida. *See* Fla. Stat. § 1006.20(1); *see also Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n*, 942 F.3d 1215, 1224 (11th Cir. 2019). In that role it has authority over certain sports activities for hundreds of public and private schools throughout the state, one of which is Cambridge Christian School.

Cambridge Christian is a private Christian school in Tampa, Florida. In 2015, after a successful regular season and playoff run, its high school football team (aka The Lancers) made it to the FHSAA state championship game. Leading up to that game, Cambridge Christian asked the FHSAA for permission to use the stadium's public address system for a prayer before the game. The FHSAA denied permission. Cambridge Christian filed this lawsuit claiming, among other things, violations of its rights under the Free Speech and Free Exercise Clauses of the United States and Florida Constitutions.

This is the lawsuit's second time before our Court. The first time we reversed the district court's grant of the FHSAA's motion to dismiss Cambridge Christian's free speech and free exercise claims, holding that the school had "plausibly alleged enough to enter the courtroom and be heard" on those claims. *See Cambridge Christian Sch.*, 942 F.3d at 1223.

In this second visit to our Court the school is appealing the district court's post-remand grant of summary judgment in favor of the FHSAA on the free speech and free exercise claims. Because we agree with the district court that the speech at issue is government speech, we affirm the grant of summary judgment to the FHSAA on both the free speech and free exercise claims.

## I. Background

### A. Prayer At Cambridge Christian School

Cambridge Christian serves students in pre-kindergarten through twelfth grades. Religion is central to the school's mission, which is: "To glorify God in all that we do; to demonstrate excellence at every level of academic, athletic and artistic involvement; to develop strength of character; and to serve the local and global community."

To further that mission, the school regularly engages in communal prayer, meaning prayer that involves the school community. Each school day begins with a prayer broadcast over the intercom. Board meetings, staff meetings, concerts, ceremonies, weekly chapel services, and many classes and activities begin with prayer. According to Cambridge Christian's head of school, communal prayer is an integral part of the school's spiritual tradition and "stimulates the spiritual growth" of its students.

Communal prayer is also a regular feature of athletics at Cambridge Christian. Coaches lead prayer at practices, and all home sporting events open with public prayer using the loudspeaker. It is Cambridge Christian's practice to offer a prayer over

the PA system before all home football games, even when the opponent is a secular school. For away games Cambridge Christian "defer[s] to the tradition of the home team," and when those games are against non-Christian schools, Cambridge Christian does not use the PA system when praying. But most of Cambridge Christian's opponents are other private Christian schools, all of which also use a PA system for prayer before their home games.

### B. FHSAA Football Playoffs

The Florida High School Athletic Association is one of the governing bodies for high school athletics in Florida. *See* Fla. Stat. § 1006.20(1). It has 25 full-time employees and administers more than two dozen sports for more than 800 public and private schools throughout the state. The FHSAA divides its member schools into classes based primarily on the number of students in the school. Cambridge Christian (or its predecessor school) has been a member of the FHSAA since 1989,[1] and, during the events that gave rise to this lawsuit, the school's football program was in Class 2A.

As part of its responsibilities the FHSAA organizes and regulates the high school football regular season and playoff games for its member schools, including the state championship game in each class of schools. The association has bylaws and administrative policies and procedures that govern all FHSAA sporting events, includ-

---

[1] But as of now, Cambridge Christian is not scheduled to compete in FHSAA football for the 2024 and 2025 football seasons.

ing regular season and playoff football games. It also has a "Football Finals Participant Manual" that governs state championship football games specifically.

Regular season and non-championship playoff games are hosted by one of the two competing schools at a venue of the schools' choosing. Even so, FHSAA policy dictates that playoff games "are not 'home contests' for the host schools" and must maintain an "atmosphere of neutrality." State championship finals are not "hosted" by either competing school, and they are subject to the FHSAA's neutrality mandate. From 2007 to 2018, the FHSAA contracted with the Central Florida Sports Commission to hold the championship games at the Citrus Bowl in Orlando.[2]

Schools typically use public address announcers for their regular season football games, and FHSAA policy requires football playoff venues to have a PA system. For regular season and non-championship playoff games, the PA announcer is chosen by the host school. For the state championship games held at the Citrus

---

[2] The parties dispute the extent to which the FHSAA itself is the "host" of state championship football games. The district court determined that the championship games are hosted by the FHSAA together with the Central Florida Sports Commission. Regardless, it is undisputed that neither of the competing schools is the "host" of the championship football game.

The Central Florida Sports Commission, now called the Greater Orlando Sports Commission, is an organization whose mission is to drive the economic development of the greater Orlando community through sports. The commission partners with venues like the Citrus Bowl and works with them to book sporting events. There is no contention by either party that the commission is a state actor.

Bowl, the PA announcer was chosen and hired by the Central Florida Sports Commission. At no point in the season are PA announcers considered FHSAA employees or contractors. According to FHSAA procedure, for regular season and playoff games, including state championship games, PA announcers are considered "bench official[s]" and must "maintain complete neutrality at all times."

The FHSAA creates scripts for all playoff football games, including state championship games, and expects PA announcers to follow those scripts. It also has a protocol that governs the use of PA systems at playoff games. According to that protocol, PA announcers must follow the PA scripts the FHSAA gives them for promotional announcements, player introductions, and awards ceremonies. The protocol limits all other announcements to: emergencies; lineups for the participating teams; messages provided by host school management (for the non-championship playoff games when there is a host school); announcements about the sale of FHSAA merchandise and concessions; and other "practical" announcements (*e.g.*, there is a car with its lights on).

As for game play, the PA protocol instructs PA announcers to recognize players attempting to make or making a play and to report penalties, substitutions, and timeouts. PA announcers may not call the "play-by-play" or provide "color commentary" (as if they were announcing for a radio or television broadcast), and they may not make comments that might advantage or criticize either team.

The FHSAA PA scripts include announcements recognizing the corporate partners that have helped make the event happen. They also include messages promoting the corporate partners' products or services. These promotional announcements are the result of sponsorship agreements that the FHSAA enters into with each sponsor.

According to the agreements, a sponsor may provide a brief statement to be read by the PA announcer over the PA system at some point during the FHSAA event in exchange for the sponsor making a financial contribution to the FHSAA. The FHSAA has guidelines regarding the types of sponsors it will contract with, and each sponsorship agreement must be approved by the FHSAA's executive director. The sponsors often draft the text of their promotional announcement themselves, but they send the proposed text to the FHSAA for approval before an FHSAA employee adds any text to a PA script.

At a typical state championship football game, the PA announcer makes a handful of scripted pregame announcements beginning about 35 minutes before kickoff. That leads into the presentation of colors, the pledge of allegiance, and the national anthem, which are also typically broadcast over the PA system. The pregame announcements conclude after the PA announcer introduces the starting players and officials, narrates the coin toss, and provides a weather report.

At halftime of championship football games, competing schools may use the PA system to play music for their halftime performances. Until 2016 schools were also permitted to use their own "half time announcer" to introduce their marching band and song selections over the PA system. But there's no evidence that either school used one at the 2015 Class 2A final, the championship game in which Cambridge Christian played.

## C. Pregame Prayer At The 2012 Class 2A Football Championship

Cambridge Christian did not make it to the Class 2A state championships in 2012, but two other Christian schools did: University Christian and Dade Christian. That year the principal of Dade Christian led a pregame prayer over the PA system. According to the PA script for that game, the prayer occurred with 30 minutes remaining on the pregame clock, right after an announcement about sportsmanship and right before an announcement about scholar-athlete awards.

It's not clear who authorized pregame prayer at the 2012 2A state championship game. Dr. Roger Dearing, the FHSAA's executive director at the time, testified that he didn't know about the prayer until this litigation and still doesn't know who at the FHSAA approved its addition to the PA script. But a former FHSAA employee testified that he believed Dr. Dearing had told him to add the prayer to the script.

That 2012 prayer is the only example in the record of a school representative delivering a pregame message (religious or

otherwise) over the PA system at an FHSAA football championship game.[3]

D. <u>The FHSAA's Denial Of Cambridge Christian's Request To Use The PA System For Pregame Prayer At The 2015 Class 2A Football Championship</u>

During the 2015 regular season, Cambridge Christian played its home football games at Skyway Park, a county-owned facility in Tampa. Before each home game, the school's PA announcer Greg Froelich or another Cambridge Christian representative used the PA system to broadcast a prayer. There was no FHSAA script at any of those regular season games and nothing in the record indicates the FHSAA knew anything about the prayers at them.

Cambridge Christian went undefeated that season and qualified for the Class 2A playoffs. The school won its playoff games against Northside Christian School, Admiral Farragut Academy, and First Baptist Academy to advance to the championship game. Cambridge Christian hosted all three of those playoff games. It played its playoff games against Northside Christian and First Baptist Academy at its home field, Skyway Park. It played its playoff game against Admiral Farragut Academy at Jefferson High School, a public school. Cambridge Christian selected Froelich to be the

---

[3] When asked how often the FHSAA turns over a PA microphone to a school representative for welcoming remarks at *any* FHSAA sporting event, the FHSAA's executive director answered: "I don't know. I can share that it's done periodically often." He gave three examples of school administrators making welcoming remarks at weightlifting meets. He then added, "I don't think it's necessarily something we customarily do."

PA announcer for each of those three playoff games, and at each game he followed the PA script prepared by the FHSAA. As was the school's usual practice, Froelich also led the assembled crowd in an unscripted, pregame prayer over the PA system before the kickoff of each game. There is nothing in the record to indicate that the FHSAA knew about any of those three prayers.

On Friday December 4, 2015, Cambridge Christian played against University Christian in the 2015 Class 2A state championship game at the Citrus Bowl. Following protocol for championship games at the Citrus Bowl, the Central Florida Sports Commission selected and hired the PA announcer for that game. As it did for all playoff games, the FHSAA also prepared the PA script. And like all other playoff PA scripts, the 2015 finals script included paid sponsor messages. There's no evidence that anyone other than the PA announcer made announcements over the PA system before or during that game.

During a conference call that took place three days before the December 4, 2015 state championship game, a University Christian representative had asked the FHSAA for permission to say a pregame prayer over the stadium loudspeaker, as it had (apparently) been allowed to do at the 2012 championship game. Cambridge Christian's athletic director was on the call and supported the request. The FHSAA responded that neither school would be allowed to use the PA system to broadcast a pregame prayer.

The day after that conference call, Cambridge Christian's then-Head of School Tim Euler emailed Dr. Dearing, who was still the FHSAA's executive director, to formally request that the FHSAA "allow two Christian schools to honor their Lord before the game and pray" over the loudspeaker. University Christian's head of school responded to the email seconding that request. About an hour after that, Dr. Dearing responded, again denying the schools' request to use the PA system for pregame prayer. He explained that after consulting with the FHSAA's lawyer, he believed federal law prevented him from granting the request for two reasons: (1) the Citrus Bowl is a "public facility," making it "off limits" under federal law and Supreme Court precedent; and (2) "the FHSAA (host and coordinator of the event) is legally a 'State Actor'" and therefore can't "permit or grant permission" for communal prayer. Dr. Dearing feared that allowing prayer over the loudspeaker would subject the FHSAA to "tremendous legal entanglements." (He is not a lawyer.)

Although the FHSAA denied the schools access to the PA system for a pregame prayer, it suggested that the schools gather as teams to pray before the start of the game. So that's what they did. University Christian and Cambridge Christian student athletes, coaches, administrators, and at least one referee prayed together at midfield before the start of the game. Both schools also prayed on the field in the minutes following the game. Those prayers were not broadcast over the PA system and could not be heard by the fans in the stands. Froelich, Cambridge Christian's announcer, was in the stands that day and, although his voice was not

amplified, he led a prayer for the fans who were standing around him.

The Monday after the championship game, Dr. Dearing sent a follow-up email to the two headmasters elaborating on his decision to deny their request. He stated his belief that "under the circumstances," if the FHSAA were to allow prayer over the PA system, the State could be seen as "endors[ing]" or "promot[ing] religion," which would violate the Establishment Clause. Dr. Dearing referred to the Supreme Court's decision in *Santa Fe Independent School District v. Doe*, 530 U.S. 290, 301 (2000), which held that a school district's policy permitting student-led prayer at football games violated the Establishment Clause; he said that the decision was "directly on point." The FHSAA explained its decision again in similar terms in a press release. (The press release did not mention that when he denied the schools access to the PA system Dr. Dearing was giving only his lay opinion.)

Cambridge Christian made the football playoffs again in 2020. That year the school's team played in the first two rounds of the playoffs before being eliminated. Cambridge Christian did not host either game, but both games were played against other Christian schools and at both games someone used the PA system to say a prayer before kickoff.

E.  Procedural History

In September 2016 Cambridge Christian brought this lawsuit against the FHSAA under 42 U.S.C. § 1983, alleging that the association had violated its rights as guaranteed by the Free Speech

and Free Exercise Clauses of the United States and Florida Constitutions. The school sought damages, a declaratory judgment, an injunction against future restrictions on pregame prayer over the PA system at football championship games, and attorney's fees. Cambridge Christian also brought claims for declaratory relief under the Establishment Clauses of the United States and Florida Constitutions and included a state law claim under Florida's Religious Freedom Restoration Act.

The district court dismissed Cambridge Christian's complaint in its entirety for failure to state a claim. The school appealed, and we affirmed in part and reversed in part. *See Cambridge Christian Sch.*, 942 F.3d 1215. We affirmed the district court's denial of declaratory relief under the federal and state Establishment Clauses and its dismissal of the school's state law claim. *Id.* at 1252. But we held that Cambridge Christian had plausibly alleged violations of the Free Speech and Free Exercise Clauses of the United States and Florida Constitutions, adding that "[t]here are too many open factual questions for us to say with confidence that the allegations" related to those claims "cannot be proven as a matter of law." *Id.* at 1223. We reversed the district court's dismissal of the federal and state free speech and free exercise claims and remanded so that the "open factual questions" could be answered through discovery. *See id.* at 1223, 1252.

On remand, after discovery the parties filed cross motions for summary judgment, each contending that after discovery those previously open questions were open no more, at least not at the

district court level.  In an order dated March 31, 2022, the district court agreed with the FHSAA and granted its summary judgment motion while denying Cambridge Christian's.  On the free speech claims, the court concluded that the speech at issue — pregame speech broadcast over the PA system at FHSAA football championship games — is government speech and therefore unrestricted by the Free Speech Clause in the United States or Florida Constitution. Alternatively, the court believed that even if some of the speech could be considered non-governmental, there was no Free Speech Clause violation because "the Citrus Bowl's PA system is a nonpublic forum" and the FHSAA's restriction was "reasonable and appropriate."  There was, the court also concluded, "no viewpoint discrimination."

As for the free exercise claims, the court concluded that Cambridge Christian's free exercise rights were not violated when it was denied access to the PA system for pregame prayer because the prayer restriction did not impermissibly burden a sincerely held religious belief.  The court made a factfinding that based on the record, communal prayer broadcast over the PA system is not Cambridge Christian's typical practice at events that it is not hosting, and it did not host the game in question.  The district court stated that while using the PA system for communal pregame prayer is the school's "preference," it is "not a deeply rooted tradition that rises to the level of a sincerely held belief" that implicates either Free Exercise Clause.

Cambridge Christian filed this appeal.

F.  House Bill 225 (2023)

In May 2023 the Florida legislature passed House Bill 225, which required the FHSAA to "adopt bylaws, policies, or procedures that provide each school participating in a high school championship contest or series of contests under the direction and supervision of the association the opportunity to make brief opening remarks, if requested by the school, using the public address system at the event."  Ch. 2023-97, Fla. Laws, § 6 (codified at Fla. Stat. § 1006.185).  The law became effective on July 1, 2023.  *Id.* § 7.

In response, the FHSAA adopted a policy that allows schools participating in state championship events to make brief opening remarks over the PA system.  *See* Florida High School Athletic Association, *2023–24 FHSAA Handbook* 60, Administrative Policy 10.7 (2024), https://fhsaa.com/documents/2023/7/13//2324_handbook.pdf?id=4394.  According to the new policy, the remarks may not exceed two minutes per school and may not be derogatory, rude, or threatening.  *See id.*  And "[b]efore the opening remarks, the announcement must be made that the content of any opening remarks by a participating school is not endorsed by and does not reflect the views and/or opinions of the FHSAA."  *Id.*

The new Florida law and the corresponding FHSAA policy create a potential mootness issue as to the prospective relief Cambridge Christian is seeking.  And there's a standing problem, which, like the mootness issue, also requires us to look at how likely it is that Cambridge Christian will suffer the same injury in the future.  We turn to those standing and mootness issues first.

## II.  Jurisdiction

We must satisfy ourselves of our own jurisdiction before proceeding to the merits of an appeal.  *See Gardner v. Mutz*, 962 F.3d 1329, 1336–37 (11th Cir. 2020).  Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies."  U.S. Const. Art. III, § 2.  One element of that case-or-controversy limitation is that a plaintiff must have standing to sue.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).  Another element is that the plaintiff's case cannot have become moot.  *Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1216–17 (11th Cir. 2000); *see Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000) (explaining that the case-or-controversy limitation "underpins" the standing and mootness justiciability doctrines); *see also Baughcum v. Jackson*, 92 F.4th 1024, 1030 (11th Cir. 2024); *Gardner*, 962 F.3d at 1336; *Christian Coalition of Fla., Inc. v. United States*, 662 F.3d 1182, 1189 (11th Cir. 2011).

Standing and mootness are closely related.  *See Schultz v. Alabama*, 42 F.4th 1298, 1320 (11th Cir. 2022).  Put simply, the two doctrines ensure that "[t]he requisite personal interest that . . . exist[s] at the commencement of the litigation (standing) . . . continue[s] throughout its existence (mootness)."  *Laidlaw*, 528 U.S. at 189 (quotation marks omitted); *see also id.* at 189–92 (discussing the differences between standing and mootness); *Christian Coalition of Fla.*, 662 F.3d at 1190 ("[T]he controversy 'must be extant at all stages of review, not merely at the time the complaint is filed.'") (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)); *Sims v. Fla.,*

*Dep't of Highway Safety & Motor Vehicles*, 862 F.2d 1449, 1459 (11th Cir. 1989) ("Mootness demands that the plaintiff's personal interest in the lawsuit (standing) continue to the lawsuit's end.").

Cambridge Christian's claims for declaratory and injunctive relief implicate both the standing and mootness doctrines. We may address standing and mootness in whatever order we prefer, *see Gardner*, 962 F.3d at 1336, and here we think it makes the most sense to first decide whether Cambridge Christian has standing to bring its claims for declaratory and injunctive relief and then decide whether those claims have since become moot. Our review of both questions is *de novo*. *Baughcum*, 92 F.4th at 1030.

## A. Standing

To establish standing, a plaintiff must have: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The plaintiff bears the burden of establishing each of those elements, *see id.*, and must do so "separately for each form of relief sought," *Laidlaw*, 528 U.S. at 185. Standing is determined as of the time the complaint was filed. *Schultz*, 42 F.4th at 1319.

A plaintiff seeking injunctive relief to prevent future injury must "establish standing by demonstrating that, if unchecked by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue, and that the 'threatened injury is certainly impending.'" *Laidlaw*, 528 U.S. at 190 (alteration adopted) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)); *see also Clapper*, 568

U.S. at 409 (explaining that a threatened injury must be "certainly impending" to satisfy the injury-in-fact requirement for standing); *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (explaining that a plaintiff complaining that he is in danger of future injury must show that the threat of injury is "both real and immediate, not conjectural or hypothetical") (quotation marks omitted); *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects."); *Elend v. Basham*, 471 F.3d 1199, 1207 (11th Cir. 2006) ("The binding precent in this circuit is clear that for an injury to suffice for prospective relief, it must be imminent."). Allegations of "*possible* future injury" are not sufficient for Article III standing. *Clapper*, 568 U.S. at 409 (quotation marks omitted).

Likewise, a plaintiff has standing to seek declaratory relief only when "there is a substantial likelihood that he will suffer injury in the future." *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 925 F.3d 1205, 1210–11 (11th Cir. 2019) (quotation marks omitted). "The controversy between the parties cannot be conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than speculative threat of future injury." *Id.* at 1210 (quotation marks omitted); *see also Elend*, 471 F.3d at 1207 (explaining that a prayer for both declaratory and injunctive relief requires a showing of "a real and immediate threat of future harm").

Cambridge Christian has not established that the threatened injury that concerns it is sufficiently imminent to justify its request

for equitable relief.   The school seeks "an injunction barring FHSAA from enforcing the Prayer Ban and prohibiting FHSAA from discriminating against religious speech over the loud-speaker."  It defines the "Prayer Ban" as the FHSAA's 2015 "policy prohibiting schools participating in the football state championship game from using the stadium loudspeaker for pregame prayer."  In other words, the school has limited its request for equitable relief to pregame prayer over the PA system at FHSAA state champion-ship football matches.  As Cambridge Christian puts it: "[Cam-bridge Christian] annually competes to make it to the champion-ship game and, if it reaches that game, it will be denied the ability to engage in its constitutionally protected religious practice and speech."[4]  But only, we would add, if it wins all of its playoff games leading to the state championship game, the final one.

---

[4] Cambridge Christian now asserts that the FHSAA's "Prayer Ban" is not lim-ited to football and that even setting football aside, the school has standing to bring claims for declaratory and injunctive relief based on its participation in other FHSAA sports.  But Cambridge Christian has not made any allegations in its complaint about being denied access to the PA system to pray at a game other than at the football championship game.  And when we asked the school to "clarify" the "exact nature of the equitable relief that [it] seeks," the school responded that it wants an injunction against the FHSAA policy against using the loudspeaker for pregame prayer at "the football state championship game."  So we will hold Cambridge Christian to that answer to our question and to the relief it sought in its complaint.  In any event, there's no evidence in the record to support the school's suggestion that its participation in a future championship game of another sport is "imminent," *see Elend*, 471 F.3d at 1207; in fact, there is no record evidence of the school making it to a championship final in any other sport besides football.

Here's the problem with Cambridge Christian's position.  Its football team has not returned to the FHSAA state championship since 2015.  In fact, 2015 is the only year the team has ever made it to the state championship since the school started its football program in 2003.  Only once in two decades.

Cambridge Christian acknowledges that its standing theory relies on "speculation" that it "will make it to another championship game," but the school contends that that speculation does not defeat standing because there's no need to prove that future harm is certain.  True, Cambridge Christian is not required to demonstrate "that it is literally certain that the harms [it] identif[ies] will come about."  *See Clapper*, 568 U.S. at 414 n.5.  But the school does need to demonstrate that future injury is "*certainly impending*," or at the very least, that there is a "*substantial risk*" that the harm will occur.  *See id*. at 414 & n.5 (emphasis added).  And given the Lancers' past performance on the gridiron, it cannot meet that standard.  All the more so because as Cambridge Christian admits, the "competitiveness" of its football team "has waned" over the last few seasons, and the team is now in what it calls a "rebuilding phase" that it expects to last for a "few years."  Hope springs eternal but standing cannot be built on hope.  With all due respect to the Cambridge Christian Fighting Lancers, there's nothing to suggest that the team's participation in a future football state championship is imminent or even likely.  *See Clapper*, 568 U.S. at 410 (rejecting the plaintiffs' "highly speculative" standing theory premised on a "highly attenuated chain of possibilities").

Cambridge Christian relies on *Gratz v. Bollinger*, 539 U.S. 244 (2003), where the Supreme Court held that a plaintiff had standing to seek declaratory and injunctive relief with respect to a university's use of race in its undergraduate admissions process, even though the plaintiff had not yet re-applied for admission, because he was "able and ready" to re-apply "should the University cease to use race in undergraduate admissions." *Id.* at 262. Cambridge Christian asserts that like the plaintiff in *Gratz*, it "stands able and ready to compete in the FHSAA league on a basis that does not discriminate" against its religious practices and speech.

*Gratz* is easily distinguishable. First, *Gratz* was an equal protection case, and this one is not. As the Supreme Court explained in *Gratz*, in an equal protection case challenging the denial of equal treatment based on the imposition of a barrier, the party challenging the barrier "need only demonstrate that it is able and ready" to compete on an equal basis "and that a discriminatory policy prevents it from doing so." *Id.* at 261–62 (quotation marks omitted). Second, in *Gratz* there was nothing keeping the plaintiff from re-applying for admission and subjecting himself to the challenged discriminatory policy, other than the challenged policy itself. Here, for Cambridge Christian to be subject to the challenged policy, it must win a specified series of football games, a task it has not been able to accomplish since 2015. While the school might be "ready" to compete in the state championship game if it ever gets to one again, it is not "able" to get to one without first clearing the many regular season and playoff hurdles that it has not been "able" to clear in the past eight years.

That the FHSAA may have violated the school's constitutional rights in 2015 by restricting use of the PA system for pregame prayer at the championship football game "presumably afford[s] [the school] standing to claim damages" against the FHSAA, but it "does nothing to establish a real and immediate threat" that it would suffer the same injury in the future. *Lyons*, 461 U.S. at 105 (holding that the plaintiff had failed to demonstrate standing for his equitable claims because the fact that he may have been illegally choked by police officers in the past was not enough to show "a real and immediate threat" that he would again be illegally choked by an officer in the immediate future). Unable to show "the threat of injury [is] both real and immediate, not conjectural or hypothetical," *id.* at 102 (cleaned up), Cambridge Christian lacks standing to bring its claims for declaratory and injunctive relief.

## B. Mootness

Even if the school had standing to bring its claims for declaratory and injunctive relief, those claims have become moot. Usually, a case must be dismissed as moot "if events that occur subsequent to the filing of a lawsuit deprive the court of the ability to give the plaintiff meaningful relief." *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1267 (11th Cir. 2020) (alterations adopted) (quotation marks omitted); *see also Fla. Ass'n of Rehab. Facilities*, 225 F.3d at 1217 ("[A] case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief.") (quotation marks omitted). "Mootness demands that there be something about the case that remains alive, present, real, and

immediate so that a federal court can provide redress in some palpable way." *Gagliardi v. TJCV Land Tr.*, 889 F.3d 728, 733 (11th Cir. 2018).

"The purpose of an injunction is to prevent future violations," so for a claim for injunctive relief to remain a live controversy there must "exist[] some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *see also Cotterall v. Paul*, 755 F.2d 777 (11th Cir. 1985) ("Past exposure to illegal conduct does not in itself show a pending case or controversy regarding injunctive relief if unaccompanied by any continuing, present injury or real and immediate threat of repeated injury.") (quotation marks omitted). Similarly, a claim for declaratory relief becomes moot when there is no longer "a substantial controversy, between parties having adverse legal interests, *of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.*" *Preiser*, 422 U.S. at 402.

Cambridge Christian's claims for declaratory and injunctive relief are moot. Based on Fla. Stat. § 1006.185 and the FHSAA's corresponding policy, which authorize pregame access to the PA system at state championship events for brief comments, it's clear that the school won't be subjected to the PA system prayer ban at future state championship football games, even if does return to FHSAA football. We recognize that under the "voluntary cessation" exception to the mootness doctrine, "[a] defendant's voluntary cessation of allegedly unlawful conduct ordinarily does

not suffice to moot a case." *Laidlaw*, 528 U.S. at 174. Otherwise a defendant could willingly change its behavior to avoid a lawsuit and then, after doing so, "return to its old ways." *See Keohane*, 952 F.3d at 1267 (alteration adopted) (quotation marks omitted).

There are circumstances where a defendant's voluntary cessation of challenged conduct may moot a case after all, but the standard for that is "stringent": A defendant's voluntary conduct may moot a case only if "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Laidlaw*, 528 U.S. at 189 (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)); *see also Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs*, 868 F.3d 1248, 1255 (11th Cir. 2017) (en banc), *abrogated on other grounds by Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021). "The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Laidlaw*, 528 U.S. at 189 (alteration adopted) (quotation marks omitted).

A government defendant can often meet that burden by formally rescinding a challenged policy. *See Keohane*, 952 F.3d at 1267–68 (adding that "the repeal of a challenged statute — or other similar pronouncement" ordinarily makes it clear that the challenged behavior can't reasonably be expected to recur) (quotation marks omitted). That's because government defendants are "more likely than private defendants to honor a professed commitment to changed ways." *Id.* (quotation marks omitted); *see also Flanigan's*,

868 F.3d at 1256 ("[G]overnmental entities and officials have been given considerably more leeway than private parties in the presumption that they are unlikely to resume illegal activities.") (quotation marks omitted); *Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga.*, 633 F.3d 1297, 1310 (11th Cir. 2011) ("Hence, the Supreme Court has held almost uniformly that voluntary cessation by a government defendant moots the claim.") (alteration adopted) (quotation marks omitted); *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1184 (11th Cir. 2007) (explaining that "government actors receive the benefit of a rebuttable presumption that the offending behavior will not recur").

Once a government defendant has repealed a challenged policy, the burden shifts to the plaintiff to present evidence that its challenge has not been mooted by that repeal. *Keohane*, 952 F.3d at 1268. To do so the plaintiff must show a "reasonable expectation" (or "substantial likelihood") that the government defendant will "reverse course" and reinstate the repealed policy if the lawsuit is terminated. *Id.* (quotation marks omitted); *see also Flanigan's*, 868 F.3d at 1256. In deciding whether a plaintiff has met that burden, we consider three non-exclusive factors: (1) "whether the change in conduct resulted from substantial deliberation or is merely an attempt to manipulate our jurisdiction"; (2) whether the decision to end the challenged conduct was "unambiguous" and can be "fairly viewed as being 'permanent and complete'"; and (3) "whether the government has consistently maintained its commitment to the new policy." *Keohane*, 952 F.3d at 1268 (quoting *Flanigan's*, 868 F.3d at 1257).

The FHSAA contends that Fla. Stat. § 1006.185 and the athletic association's corresponding policy have eliminated any likelihood that Cambridge Christian will be denied the opportunity to offer a pregame prayer over the PA system at a future championship football game (assuming the prayer complies with the statute and policy). We agree. The new law and policy unambiguously allow for brief opening remarks over the PA system at state championship events. The only content restriction on those remarks is that they may not be derogatory, rude, or threatening, and they can be no longer than two minutes in length. There are no specific restrictions applicable only to prayer. The law and corresponding policy effectively "repeal" the FHSAA's earlier prayer restriction, making it clear that the allegedly wrongful conduct — a ban of all pregame prayer over the PA system at a state championship football game — cannot reasonably be expected to recur. *See Laidlaw*, 528 U.S. at 189.

Cambridge Christian insists that the new state law and FHSAA policy have not mooted its claims for equitable relief because the FHSAA could still enforce the PA system prayer ban on the ground that the ban is required by the Establishment Clause. In supplemental briefing, the FHSAA has clarified its "position" that the "use of the PA system at Florida championship athletic contests by representatives of a school to deliver a pregame communal prayer that complies with the statute and the FHSAA's corresponding Administrative Policy does not violate the Establishment Clause or any other federal law." Cambridge Christian asks us to reject that "new version" of the FHSAA's "Establishment

Clause Policy" as manufactured for litigation. The school fears that because the FHSAA has not repudiated its previous Establishment Clause position or publicly committed to its new one, the FHSAA could still decide that under certain circumstances, pregame prayer over the PA system violates the Establishment Clause.

Cambridge Christian has not met its burden of showing a substantial likelihood that if this lawsuit is terminated the FHSAA will reverse course and ban use of the PA system for pregame prayer. *See Keohane*, 952 F.3d at 1267–68. True, the FHSAA stands by its executive director's belief in 2015 that allowing prayer over the PA system would have been an Establishment Clause violation "under the circumstances" *then*, but that question is not before us. *See Cambridge Christian Sch.*, 942 F.3d at 1252 (affirming the dismissal of Cambridge Christian's Establishment Clause claims).

As the FHSAA points out, the circumstances have changed enough that allowing pregame PA prayer *now* would not violate the Establishment Clause. In 2015 the FHSAA refused to give the schools pregame access to the PA system for religious speech when that access had not been historically available to other private speakers. *See infra* at 40–42. After the passage of Fla. Stat. § 1006.185, it appears that access has been made equally available to all speakers, religious and secular. And the Establishment Clause does not require the government to "refus[e] to extend free speech rights to religious speakers who participate in broad-reaching government programs" that are "neutral toward religion." *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 839–40 (1995).

Also, while the new statute may have been enacted in response to Cambridge Christian's legal challenge, there's no evidence the change is temporary or was made in "an attempt to manipulate our jurisdiction." *See Flanigan's*, 868 F.3d at 1257. Nor is there evidence that the FHSAA's policy change was made in an attempt in manipulate our jurisdiction; it was done to comply with the newly enacted state statute.[5]

For both standing and mootness reasons, we lack jurisdiction to consider Cambridge Christian's claims for declaratory and injunctive relief.

C. Nominal Damages

Even though we lack jurisdiction to consider Cambridge Christian's claims for declaratory and injunctive relief, we must proceed to the merits of the school's First Amendment claims because we have jurisdiction over the school's claims for nominal damages to redress the injury the school alleges to have suffered from the FHSAA's past constitutional violations. *See Uzuegbunam*, 141 S. Ct. at 802 ("[F]or the purpose of Article III standing, nominal damages provide the necessary redress for a complete violation of

---

[5] Cambridge Christian briefly asserts that the capable-of-repetition-yet-evading-review exception to mootness applies. It does not. For reasons already discussed, the school cannot show a "reasonable expectation" that it will be "subjected to the same action again," which is one of the requirements for that exception to mootness to apply. *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975); *see also Murphy v. Hunt*, 455 U.S. 478, 482 (1982) (explaining that "a mere physical or theoretical possibility" of repeated action is not sufficient to invoke the exception).

a legal right."); *Keister v. Bell*, 29 F.4th 1239, 1251, 1256 (11th Cir. 2022) (concluding that the plaintiff had standing to bring his claim for nominal damages for the defendants' past alleged violation of his First Amendment rights, and that the nominal damages claim had not been mooted by the defendants' replacement of the challenged policy); *see also Powell v. McCormack*, 395 U.S. 486, 497 (1969) ("Where one of the several issues presented becomes moot, the remaining live issues supply the constitutional requirement of a case or controversy.").

The FHSAA contends that Cambridge Christian has "waived and forfeited" its claim for nominal damages by not raising the possibility of them until this appeal. In its amended complaint Cambridge Christian asked for "[d]amages pursuant to 42 U.S.C. § 1983" and "28 U.S.C. § 2202" based on the alleged violations of its free speech and free exercise rights. Nowhere did the school specifically request nominal damages.

But a plaintiff need not plead nominal damages in a First Amendment case to be entitled to them. Nominal damages are "require[d] . . . upon proof of infringement of a fundamental First Amendment liberty." *Familias Unidas v. Briscoe*, 619 F.2d 391, 397, 402 (5th Cir. 1980) (holding that where the plaintiff sought declaratory and injunctive relief and compensatory damages for a violation of her First Amendment right of association but could not prove compensable injury, she was "entitled to receive nominal

damages" based on the First Amendment violation alone)[6]; *see also Uzuegbunam*, 141 S. Ct. at 800 ("Nominal damages are not a consolation prize for the plaintiff who pleads, but fails to prove, compensatory damages.  They are instead the damages awarded *by default* until the plaintiff establishes entitlement to some other form of damages, such as compensatory or statutory damages.") (emphasis added); *Howard v. Int'l Molders & Allied Workers Union*, 779 F.2d 1546, 1553 (11th Cir. 1986) (quoting favorably *Basista v. Weir*, 340 F.2d 74, 87 (3d Cir. 1965), which held that as a matter of federal common law "[i]t is not necessary to allege nominal damages and nominal damages are proved by proof of deprivation of a right to which the plaintiff was entitled"); *KH Outdoor, LLC v. City of Trussville*, 465 F.3d 1256, 1261 (11th Cir. 2006) (explaining that "nominal damages are . . . appropriate in the context of a First Amendment violation," even where the plaintiff "suffers no compensable injury") (quotation marks omitted); *Al-Amin v. Smith*, 511 F.3d 1317, 1335 (11th Cir. 2008) ("Our precedent thus recognizes the award of nominal damages for violations of the fundamental constitutional right to free speech absent any actual injury.") (quotation marks omitted).

The FHSAA relies on *Oliver v. Falla*, 258 F.3d 1277, 1282 (11th Cir. 2001), to support its contention that Cambridge Christian has waived its nominal damages claim.  In *Oliver* we held that the

---

[6] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

plaintiff "waived" his right to nominal damages by failing to request a nominal damages jury instruction. 258 F.3d at 1282. But this case is not like *Oliver*. For one thing, *Oliver* was an Eighth Amendment excessive force case, not a First Amendment case, and "the elements and prerequisites for recovery of damages appropriate to compensate injuries caused by the deprivation of one constitutional right are not necessarily appropriate to compensate injuries caused by the deprivation of another." *Carey v. Piphus*, 435 U.S. 247, 264–67 (1978) (holding that a § 1983 plaintiff is entitled to nominal damages for the deprivation of procedural due process even in the absence of actual injury because the right to procedural due process is "absolute"). Indeed, in *Oliver* we "question[ed] whether nominal damages are appropriate in an Eighth Amendment case" at all and concluded that at the very least they are "not automatic." 258 F.3d at 1282. Not so in a First Amendment case, where nominal damages are presumed when there has been proof of liability. *See Familias Unidas*, 619 F.2d at 402 (extending "the rationale of *Carey*" to the First Amendment context).

The parties' joint pretrial statement, which Cambridge Christian signed, states that "[n]either party claims monetary damages in this action." But that pretrial statement would have "govern[ed] the trial" and does not necessarily apply at this pretrial stage in the litigation. M.D. Fla. R. 3.06(b). Even if we were to hold the parties to their pretrial statement, we don't read that disclaimer of monetary damages to include waiving any potential claim for nominal damages.

So on to the merits.

### III.  Discussion

When the parties have filed cross-motions for summary judgment, we review *de novo* the district court's grant of summary judgment and view the facts in the light most favorable to the non-moving party on each motion.  *See LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1189 (11th Cir. 2010).  Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  We may affirm the district court for any reason supported by the record.  *Waldman v. Conway*, 871 F.3d 1283, 1289 (11th Cir. 2017).

The First Amendment provides, in relevant part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech . . . ."  U.S. Const. Amend. I.  Cambridge Christian claims that the FHSAA violated its First Amendment free speech and free exercise rights when it denied the school the opportunity to use the loudspeaker to broadcast a pregame prayer at the 2015 football finals.  We will examine each claim in turn.[7]

---

[7] The same principles and analyses that apply to Cambridge Christian's claims brought under the Free Speech and Free Exercise Clauses of the United States Constitution also apply to its claims brought under the analogous clauses of the Florida Constitution.  *Cambridge Christian Sch.*, 942 F.3d at 1228 n.2.

A.  Free Speech

The Free Speech Clause of the First Amendment "works as a shield to protect *private* persons from encroachments by the government on their right to speak freely, not as a sword to compel the government to speak for them." *Leake v. Drinkard*, 14 F.4th 1242, 1247 (11th Cir. 2021) (alteration adopted) (citation and quotation marks omitted); *see also Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009) ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech."). When the government speaks for itself, "it is not barred by the Free Speech Clause from determining the content of what it says," *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015), and "it can freely select the views that it wants to express," *Mech v. Sch. Bd. of Palm Beach Cnty.*, 806 F.3d 1070, 1074 (11th Cir. 2015) (quotation marks omitted).  So if the speech at issue here is government speech, Cambridge Christian's free speech claims necessarily fail.  *See id.* at 1072; *Shurtleff v. City of Boston*, 596 U.S. 243, 251 (2022).

"Whether speech is government speech is inevitably a context specific inquiry." *Mech*, 806 F.3d at 1075.  There is no "precise test" for determining whether speech is government or private speech, *id.* at 1074, but we generally consider three factors: "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled

the expression." *Shurtleff*, 596 U.S. at 252; *see also Mech*, 806 F.3d at 1074–75; *Leake*, 14 F.4th at 1248.

Those three factors — history, endorsement, and control — are not exhaustive and may not all be relevant in every case. *Mech*, 806 F.3d at 1075; *see Shurtleff*, 596 U.S. at 252 (describing the government speech analysis as a "holistic inquiry" that is "driven by a case's context rather than the rote application of rigid factors"). "But a finding that *all* [three factors] evidence government speech will almost always result in a finding that the speech is that of the government." *Leake*, 14 F.4th at 1248.

We are deciding the constitutionality of (in Cambridge Christian's words) a "policy prohibiting schools participating in the football state championship game from using the stadium loudspeaker for pregame prayer." For that reason, and given the "context specific inquiry" that is the government speech analysis, *Mech*, 806 F.3d at 1075, we will focus our government speech inquiry primarily on pregame speech over the PA system at FHSAA football championship games, as opposed to speech at any other game, sport, or period of the championship game. *See Santa Fe*, 530 U.S. at 302–03 (in considering whether student-led pregame prayer is government speech or private speech, focusing its analysis on speech during the pregame ceremony); *see also Shurtleff*, 596 U.S. at 253–58 (in considering whether a city's flag raising program constituted government speech, acknowledging the "general history" of flag flying but focusing on "the details of *this* flag-flying program" to conclude that the speech was private).

Here, the district court determined that all three factors "strongly" support a finding of government speech. We agree.

1. History

The first factor we look to is the "history of the expression at issue." *Shurtleff*, 596 U.S. at 252. This factor "directs us to ask whether the type of speech under scrutiny has traditionally 'communicated messages' on behalf of the government." *Cambridge Christian Sch.*, 942 F.3d at 1232 (quoting *Walker*, 576 U.S. at 211); *see Leake*, 14 F.4th at 1248.

In our earlier decision in this case we concluded that the history factor "plausibly weighs in favor of characterizing the speech over the loudspeaker as being, at least in part, private." *Cambridge Christian Sch.*, 942 F.3d at 1232. Now, with the benefit of a fully developed record at the summary judgment stage, we conclude that pregame speech over the PA system at football finals has traditionally constituted government speech. The pregame PA speech is entirely scripted and is typically limited to welcome messages from the FHSAA, announcements from sponsors, scholar athlete awards, the national anthem introduction and performance, the presentation of colors, the pledge of allegiance, and the introduction of the starters and officials — all narrated by the PA announcer, who is selected by the Central Florida Sports Commission and not by the schools competing in the game. The national anthem, presentation of colors, and pledge of allegiance are "inseparably associated with ideas of government." *See id.* at 1233. And in

context it's clear that the other introductory announcements are communicated on behalf of the FHSAA, a state actor.

There is only one example in the record of *any* private speaker using the PA system for a pregame message (religious or secular) at an FHSAA football state championship, and that was at the 2012 Class 2A finals when the principal of Dade Christian led the community in prayer.[8]  One instance does not a history make.

Cambridge Christian points to the pregame prayers over the loudspeaker at their non-championship playoff football games in 2015 and 2020 to argue that the history factor weighs in favor of private speech.  But the critical distinction between non-championship and championship playoff games in this league is that non-championship games are hosted by one of the participating schools while championship games are hosted at a neutral site by the Central Florida Sports Commission in partnership with the FHSAA. *See supra* at 5–6.  Because the government speech analysis is context-specific and the central question is "whether the government is *speaking* instead of regulating private expression," *Shurtleff*, 596

---

[8] Even looking at PA speech at *all* playoff games for *all* FHSAA sports, as Cambridge Christian would have us do for our government speech analysis, the 2012 Class 2A football finals is the only time an FHSAA script has mentioned prayer.  And out of the hundreds of FHSAA scripts in the record, the school points to only two other instances where a school representative may have offered some kind of introductory remarks over the PA system at an athletic event of any kind: the 2019 boys weightlifting state championships, and the 2020 girls weightlifting state championships.  In both instances the school representative would have been a public school principal, not a private speaker.

U.S. at 262 (Alito, J., concurring), we believe that distinction matters. *See also Cambridge Christian Sch.*, 942 F.3d at 1232 (suggesting that "how closely the FHSAA administered or monitored the early round playoff games hosted by Cambridge Christian" might be relevant to the government speech analysis).

As the host of its 2015 playoff games, Cambridge Christian chose the venue and the PA announcer for those games. For the football championships at the Citrus Bowl, on the other hand, the FHSAA chose the venue, and the Central Florida Sports Commission chose the PA announcer. While the FHSAA prepares the PA scripts for all playoff football games, the pregame prayers at the non-championship football games were unscripted, and it's undisputed that Cambridge Christian did not ask permission from the FHSAA to pray over the PA system at those games. In fact, there's no evidence that the FHSAA actively monitored those early round playoff games or even knew that prayer was taking place at them. For all of those reasons, we don't give much weight to the unscripted pregame prayer at non-championship playoff games.

The few scripted promotional messages from sponsors do not transform the pregame PA speech into private speech. The promotional messages are often drafted by that sponsor, but they must be approved and added to the PA script by the FHSAA. "When, as here, the government sets the overall message to be communicated and approves every word that is disseminated, it is not precluded from relying on the government-speech doctrine merely because it solicits assistance from nongovernmental

sources in developing specific messages." *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 560–62 (2005) (holding that a promotional campaign written by a nongovernment entity constituted government speech when the message was "effectively controlled by" the government and the government "exercise[d] final approval authority over every word used in every promotional campaign"); *see also Summum*, 555 U.S. at 470–72 (holding that privately designed or funded monuments that the government accepts and displays on government land speak for the government); *Walker*, 576 U.S. at 216–17 (holding that where private parties propose designs that Texas may accept and display on its license plates, the messages still constitute government speech).

In sum, because the PA system "has traditionally communicated messages on behalf of the government" during the pregame period of football championship games, *Cambridge Christian Sch.*, 942 F.3d at 1232 (quotation marks omitted), the history factor weighs in favor of the conclusion that this is government speech.

### 2. Endorsement

The endorsement factor "asks whether the kind of speech at issue is 'often closely identified in the public mind with the government.'" *Id.* (quoting *Summum*, 555 U.S. at 472). Put another way, it asks whether "observers reasonably believe the government has endorsed the message." *Id.* at 1232–33 (quoting *Mech*, 806 F.3d at 1076).

We previously concluded that based on the allegations in Cambridge Christian's amended complaint, the endorsement factor appeared to weigh in favor of government speech. *Id.* at 1234. Discovery has borne that out. Nearly all of the alleged facts that we believed favored government speech are now undisputed: (1) "[t]he state organized the game"; (2) it was the championship game of "a class of a league organized by the FHSAA"; (3) "[t]he public-address system was part of a stadium owned by the government"; (4) the PA announcer was a neutral party[9]; (5) "[t]he prayer would have come at the start of the game, around when the National Anthem and Pledge of Allegiance are traditionally performed," which are rituals "inseparably associated with ideas of government"; (6) the loudspeaker was not used during the championship "by anyone other than the public-address announcer, with the exception of music played for the half time performances"; (7) there was no "host school" in the traditional sense at this championship game, which was held at a "neutral location"; and (8) the 2015 Football Finals Participant Manual doesn't indicate there was any room for

---

[9] Based on the allegations in the amended complaint and its accompanying exhibits, we had described the PA announcer for the 2015 finals as a "representative of the government." *Cambridge Christian Sch.*, 942 F.3d at 1233. We know now that the PA announcer was not chosen by the FHSAA and was not considered an FHSAA employee. But it's undisputed that he was not a representative of either school. Given that fact and the fact that the 2015 finals was a state-organized championship event, the public would likely perceive the PA announcer to be a representative of the government, and that counts for this factor. *See Shurtleff*, 596 U.S. at 252; *Summum*, 555 U.S. at 472; *Mech*, 806 F.3d at 1076.

announcements by anyone other than the PA announcer. *Id.* at 1233–34.

On top of all of that, "[t]he types of messages conveyed over the loudspeaker" by the PA announcer during the pregame period — welcome messages from the FHSAA, awards, and player introductions — "also suggest that observers would believe the government endorsed the messages." *Id.* at 1233. While any one of those facts alone might not indicate government endorsement, all together they paint a compelling picture.

Cambridge Christian counters that the prayer at the 2015 state championship game would have been delivered by a school representative and not the PA announcer, *perhaps* even after an introductory disclaimer by the PA announcer, which would have allowed the fans to distinguish between FHSAA speech and school speech. But "[t]he fact that private parties take part in the design and propagation of a message does not extinguish the governmental nature of the message or transform the government's role into that of a mere forum-provider," especially where the surrounding context otherwise indicates government endorsement. *Walker*, 576 U.S. at 217; *see id.* at 212–14, 216 (explaining that privately designed messages on state license plates still "have the effect of conveying a government message") (quoting *Summum*, 555 U.S. at 472); *Leake*, 14 F.4th at 1249–50 (holding that private sponsorship of and participation in a military parade did not "extinguish the governmental nature of the message, especially if, as here, the government is or-

ganizing and funding the event through which the message is communicated") (citation and quotation marks omitted); *see also Gundy v. City of Jacksonville*, 50 F.4th 60, 79 (11th Cir. 2022) (finding that the endorsement factor weighed in favor of government speech even where the speech at issue, a legislative prayer, was made by a private party, and finding it relevant that the prayer was delivered along with the pledge of allegiance during the opening of a government occasion); *Dean v. Warren*, 12 F.4th 1248, 1265 (11th Cir. 2021) (separate opinion) (concluding that, where the speech at issue was speech by cheerleaders for a public university, government endorsement was "even more apparent in the context of the national anthem and other pre-game rituals"). Considering the context in which the prayer would have occurred, the identity of the speaker and any introductory disclaimer — if there were a disclaimer — would not have tipped the scales away from government endorsement in this specific case.

Cambridge Christian also argues that the sponsor advertisements cut against a finding of government endorsement. As we said in our earlier opinion, an announcer at a state-organized, state championship game who "guides the spectators through" the national anthem, the pledge of allegiance, the presentation of colors, and the introduction of starters, "and who maintains neutrality while calling plays would have been closely associated in the minds of spectators with the FHSAA." *Cambridge Christian Sch.*, 942 F.3d at 1234; *see also supra* at 42–43. For that reason, and without knowing more about the content of the sponsor messages, we previously suggested that "advertisements read by the announcer would also

likely be perceived as government-endorsed." *Cambridge Christian Sch.*, 942 F.3d at 1234. But we suggested that the content of the ads might necessitate a different conclusion after discovery. *Id.*; *see also Mech*, 806 F.3d at 1076–77 (in concluding that promotional banners hung on school fences were endorsed by the government, finding it relevant that the banners were designed to recognize and "thank" the school's business partners and sponsors and were not "purely private advertising").

As it turns out, the sponsor messages that were read during the pregame period of the 2015 finals indicate FHSAA endorsement. A pair of messages announced that the Bright House Sports Network, "the official television partner of the FHSAA," would be streaming the game coverage live and would be airing replays of all eight FHSAA football championship games. Another message was on behalf of Team IP, the official merchandising company of the FHSAA, reminding fans to purchase an "FHSAA championship souvenir." The final sponsorship message asked athletic directors and coaches to stop by a designated suite to see new football and gear offerings from Champion Athletic Wear, the presenting sponsor of the 2015 final game. Those messages are closer to the recognition of official partners than they are to "purely private advertising." *See Mech*, 806 F.3d at 1077. Not to mention that they are sprinkled amongst welcome messages, sportsmanship announcements, scholar-athlete awards, player introductions, and other pregame rituals that spectators would undoubtably associate with the FHSAA.

More traditional advertisements do appear elsewhere in the 2015 finals script. But as we've discussed, we think PA speech during other points in the game is not as relevant to our government speech analysis in this case as is the pregame PA speech. *See supra* at 37–38; *see, e.g.*, *Shurtleff*, 596 U.S. at 255. In any event, those advertisements were conveyed by a neutral announcer over a government-owned PA system throughout the course of a government-organized event, all made on behalf of "corporate partners" of the FHSAA. That combination would lead a reasonable spectator to believe that even those ads were delivered with FHSAA approval. *See Mech*, 806 F.3d at 1076 (finding the partnership designation relevant to endorsement); *Leake*, 14 F.4th at 1250 (same).[10]

In short, "we can safely assume" that the FSHAA "generally would not allow a public-address system to be used" at an event it organizes "to convey messages [it] didn't want to be associated with." *See Cambridge Christian Sch.*, 942 F.3d at 1233; *see also Summum*, 555 U.S. at 471–72 (in holding that privately funded and donated monuments displayed in public parks are government speech, explaining that "parks are often closely identified in the public mind with the government unit that owns the land" and that "[i]t certainly is not common for property owners to open up their

---

[10] Cambridge Christian points out that some FHSAA employees consider sponsor advertisements to be messages from that sponsor, not from the FHSAA. That argument misses the point of the endorsement inquiry, which is whether the *public* would consider the messages to be spoken or at least endorsed by the government. *See Shurtleff*, 596 U.S. at 252; *Mech*, 806 F.3d at 1076.

property for the installation of permanent monuments that convey a message with which they do not wish to be associated"); *Leake*, 14 F.4th at 1249–50 (concluding that observers would interpret speech during a military parade as being endorsed by the government because governments "typically do not organize and fund events that contain messages with which they do not wish to be associated") (quotation marks omitted); *Mech*, 806 F.3d at 1076 (concluding that the endorsement factor favored government speech, in part because "schools typically do not hang [banners] on school property for long periods of time if they contain messages with which the schools do not wish to be associated") (alterations adopted) (quotation marks omitted); *Walker*, 576 U.S. at 212 (concluding that license plate designs are "closely identified in the public mind" with the government because "license plates are, essentially government IDs" and "issuers of ID[s] typically do not permit the placement on their IDs of messages with which they do not wish to be associated") (alteration adopted) (quotation marks omitted); *see also Dean*, 12 F.4th at 1265 (finding it relevant to endorsement that messages from public university cheerleaders were conveyed "on government property at government-sponsored school-related events") (quotation marks omitted).

For those reasons, in this specific context, the spectators would reasonably believe the government endorses the pregame speech over the PA system at the state championship game.

### 3. Control

The final factor — control — asks "whether the relevant government unit 'maintains direct control over the messages conveyed' through the speech in question." *Cambridge Christian Sch.*, 942 F.3d at 1234 (quoting *Walker*, 576 U.S. at 213). It is the government's control over the "content and meaning" of the messages that is "key," as that is the type of control that indicates that the government "meant to convey the . . . messages." *Shurtleff*, 596 U.S. at 256 (explaining that the city's control over an event's date and time, the physical premises, and the hand crank used to raise flags is not the kind of control this factor focuses on). Even so, the government need not have "complete control" over "every word or aspect of speech in order for the control factor to lean toward government speech." *Cambridge Christian Sch.*, 942 F.3d at 1235–36; *see also Leake*, 14 F.4th at 1250 ("The government-speech doctrine does not require omnipotence.").

In our earlier opinion we concluded that based on the limited record, the control factor did not "point clearly in either direction." *Cambridge Christian Sch.*, 942 F.3d at 1235. We agree with the district court that the record now points in the direction of government control.

At the 2015 football finals, the only person who made announcements over the PA system at any point during the game was the PA announcer. His announcements were entirely scripted (except for a halftime announcement about the game's statistical leaders which, of course, couldn't be scripted in advance). Every word

46                    Opinion of the Court                    22-11222

of that script was put there by an FHSAA employee. On top of that, in 2015 the FHSAA had rules governing the content of announcements and in-game commentary, and those rules required the PA announcer to follow the PA script. *See Shurtleff*, 596 U.S. at 257 (noting that "written policies or clear internal guidance" about speech content would evidence control). The 2012 prayer is the only example in the record of anyone other than the PA announcer delivering a pregame message over the PA system at a football championship, and even that was with FSHAA approval — the prayer made it into the FHSAA's PA script for that game.

Even the PA use at halftime indicates government control. Until 2016 participating schools were allowed to use a halftime announcer, but only to accompany the school's marching band or to introduce a song selection, and even that was pursuant to FHSAA policy. (Again, there's no evidence that either school took advantage of that policy in 2015.) The FSHAA tightly controls the length of halftime performances. As for halftime song selections, the FHSAA does not pre-screen the music the marching bands play, but it prohibits schools from playing music that it deems offensive.[11]

Relying on *Shurtleff v. City of Boston*, Cambridge Christian argues that because the FHSAA rarely rewords or rejects messages

---

[11] The FHSAA also exercises control over the content of "filler music" that is played during football finals. At the 2020 football championships, an FHSAA employee intervened and stopped the playing of a song with uncensored profanity over the PA system.

from sponsors, it does not "actively control[]" the PA speech.  *See id.* at 256.  But *Shurtleff* is distinguishable.  In that case the Supreme Court considered whether the flags that the city of Boston allowed groups to fly at city hall constituted government speech.  *Id.* at 247, 251.  The Court concluded that the control factor favored private speech because the city did not "actively control[] these flag raisings" or "shape[] the messages the flags sent."  *Id.* at 256.  The city invited anyone to apply to the flag raising program, and its practice was to approve all applications "without exception" and without ever seeing the flags in advance.  *Id.* at 256–57.  The Court found it relevant that the city had no record of ever denying a request until it denied the plaintiffs', and it had "no written policies or clear internal guidance [] about what flags groups could fly and what those flags would communicate."  *Id.* at 257.

The FHSAA's approach to sponsor messages is very different from the city of Boston's "come-one-come-all attitude" in *Shurtleff*.  *Id.*  It's true that the FHSAA's sponsors often draft their own proposed announcements, and that the FHSAA usually inserts those announcements into PA scripts without revision.  It's also true that the FHSAA has not developed any formal policies or procedures for reviewing the text of sponsor announcements.  But here's the key: the FHSAA enters into sponsorship agreements with those sponsors — agreements that must be approved by the FHSAA's executive director — in which the sponsors pay a fee to the FHSAA in exchange for being allowed to advertise.  In other words, unlike in *Shurtleff* where the city allowed anyone who submitted an application to participate in the flag raising program, *id.* at 256, here the

FHSAA has advance notice of (and, critically, control over) which entities will be submitting sponsor messages. And because of their preexisting relationship with the FHSAA, the sponsors are generally familiar with the kinds of messages the FHSAA would deem appropriate. So the fact that the FHSAA rarely rewords or rejects the proposed speech carries significantly less weight than it did in *Shurtleff*.

This case is more like *Summum*, where the Supreme Court held that monuments in a public park represented government speech even where the monuments were designed or built by private entities, because the city "exercis[ed] final approval authority" over which monuments to display and never "opened up the Park for the placement of whatever permanent monuments might be offered by private donors." 555 U.S. at 472–73 (quotation marks omitted); *see also id.* at 468 (adding that the government may "express its views when it receives assistance from private sources for the purpose of delivering a government-controlled message"). And more like *Walker*, where the government likewise had to approve every license plate design before the design could appear on a license plate. 576 U.S. at 213. The FHSAA chooses in advance the entities that will receive advertising privileges, and all proposed sponsorship announcements are submitted to the FHSAA for final approval before an FHSAA employee adds them to a PA script. *See also Gundy*, 50 F.4th at 79–80 (finding evidence of government control where the government selected the speaker because "inviting speakers to give invocations inherently exhibits governmental control over the invocation messages from the outset of the selection

process," even if the government didn't have "editorial rights over the exact content of the invocations"); *Leake*, 14 F.4th 1250–51 (concluding that the city "effectively controlled the messages conveyed" at a military parade "by requiring applicants to describe the messages they intended to communicate and then by exercising final approval authority over their selection based on those descriptions," and adding that "[e]ither exclusion or advance preconditions would be adequate control") (quotation marks omitted).

We conclude that the control factor, like the other two government speech factors, suggests that the speech at issue is government, not private, speech. *See Leake*, 14 F.4th at 1248 ("[A] finding that *all* [factors] evidence government speech will almost always result in a finding that the speech is that of the government."). And because the pregame PA announcements are government speech, that speech does not violate the Free Speech Clause. Accordingly, the district court properly granted the FHSAA summary judgment as to Cambridge Christian's free speech claims.

B.  Free Exercise

The FHSAA is also entitled to summary judgment on Cambridge Christian's free exercise claims for the same reason.

"[T]he Free Exercise Clause . . . requires government respect for, and noninterference with, the religious beliefs and practices of our Nation's people." *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). But the government is not liable for suppressing the free exercise

of religion "when [it] restrains only its *own* expression."[12]  *See Cap. Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 768 (1995) (plurality opinion).  In other words, the government's own speech cannot support a claim that the government has interfered with a private individual's free exercise rights.  *See also Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 139 n.7 (1973) (Stewart, J., concurring) ("Government is not restrained by the First Amendment from controlling its own expression."); *Johanns*, 544 U.S. at 553 ("[T]he Government's own speech . . . is exempt from First Amendment scrutiny."); *see also Santa Fe*, 530 U.S. at 302 ("[T]here is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect.") (quotation marks omitted); *Bowen v. Roy*, 476 U.S. 693, 699–700 (1986) ("Never to our knowledge has the Court interpreted the First Amendment to require the Government *itself* to behave in ways that the individual believes will further his or her

---

[12] To hold otherwise would put government officials "in a vise between the Establishment Clause on one side and the Free Speech and Free Exercise Clauses on the other." *Cap. Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 768 (1995) (plurality opinion).  If the Free Exercise Clause required the government to accommodate religion in its *own* expression in some circumstances, then compliance with the Free Exercise Clause could itself lead to a violation of the Establishment Clause.  *See also id.* (explaining that if the Establishment Clause could apply to bar private religious expression in public forums, government officials would face a Catch-22: permitting the speech could lead to an Establishment Clause violation, whereas restricting the speech could lead to a free speech or free exercise violation).

spiritual development or that of his or her family. The Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens . . . . The Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can extract from the government.") (alteration adopted) (quotation marks omitted); *Gundy*, 50 F.4th at 64 (holding that a legislative invocation constituted government speech and so was "not subject to attack on free speech *or free exercise* grounds") (emphasis added).

Because we conclude that the FHSAA was regulating its own expression when it restricted pregame speech over the PA system at the 2015 football championships, *see supra* at 49, Cambridge Christian's free exercise claims fail. *See also Simpson v. Chesterfield Cnty. Bd. of Supervisors*, 404 F.3d 276, 288 (4th Cir. 2005) (agreeing with the district court's determination that the speech at issue was government speech, which is subject "only to the proscriptions of the Establishment Clause," and affirming the grant of summary judgment to the government on the plaintiff's free speech and free exercise claims for that reason) (quotation marks omitted).

## IV. Conclusion

We vacate the district court's judgment in favor of the FHSAA on Cambridge Christian's claims for declaratory and injunctive relief, and we remand with instructions for the district court to dismiss those claims for lack of subject matter jurisdiction.

We otherwise affirm the district court's summary judgment in favor of the FHSAA on Cambridge Christian's free speech and free exercise claims.

**AFFIRMED in part, VACATED in part, and REMANDED with instructions.**