**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-14082
Non-Argument Calendar
_____

JOSEPH WM. NUSSBAUMER, JR.,

*Plaintiff-Appellant,*

*versus*

SECRETARY, FLORIDA DEPARTMENT OF
CHILDREN AND FAMILIES,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:22-cv-00448-MW-MAF
_____

Before Newsom, Kidd, and Tjoflat, Circuit Judges.

Tjoflat, Circuit Judge:

Florida law requires those convicted of domestic violence[1] complete a batterers' intervention program ("BIP"). But Florida does not offer BIPs. Instead, private parties offer courses, and the state's Department of Children and Family ("DCF") certifies and regulates them. DCF sets BIP curriculum standards and prohibits courses from employing any "faith-based ideology associated with a particular religion or denomination."

Dr. Joseph Wm. Nussbaumer, Jr. is a Florida minister and licensed clinical Christian psychologist.[2] He was a BIP provider for court-mandated participants for thirty years, largely without proper certification. In 2022, Dr. Nussbaumer sent in a formal application to become certified as a BIP provider, but he was rejected by DCF. Because courts and probation officers are now vetting providers for DCF certification, Dr. Nussbaumer is unable to see court-ordered participants. DCF refuses to certify Dr. Nussbaumer because his curriculum incorporates the "Biblical view of domestic violence" and provides a patient-specific approach addressing

---

[1] Domestic violence offenses, under Florida law, include "assault, aggravated assault, battery, aggravated battery, sexual assault, sexual battery, stalking, aggravated stalking, kidnapping, false imprisonment, or any criminal offense resulting in physical injury or death of one family or household member by another family or household member." Fla. Stat. § 741.28 (2024).

[2] Dr. Nussbaumer is licensed by the Federal Association of Christian Counselors and Therapists, for which he serves on the board.

substance abuse, anger management, and impulse control as causal factors for domestic violence.

Dr. Nussbaumer sued DCF, alleging it violated his rights under the Free Speech and Free Exercise Clauses of the First Amendment. The District Court granted summary judgment for DCF, concluding that court-ordered BIPs are government speech, and their content can be set by the state. After careful review, for the reasons set forth below, we affirm.

## I. BACKGROUND

In 1995, Florida enacted a law requiring those found guilty of a crime of domestic violence to attend a BIP as a condition of probation. Ch. 95-195, § 19, Fla. Laws (1995); *see* Fla. Stat. § 948.038 (2024). The law established an Office for Certification and Monitoring of Batterers' Intervention Programs within the Department of Corrections to "certify and monitor both programs and personnel providing direct services" to court-ordered participants. Ch. 95-195, § 16, Fla. Laws (1995). The purpose of certification was to "uniformly and systematically standardize programs to hold those who perpetrate acts of domestic violence responsible for those acts and to ensure safety for victims of domestic violence." *Id.* § 17.

The law directed the Department of Corrections to promulgate rules governing standards of care, appropriate intervention approaches, program content, and qualifications of providers, among other facets of BIPs. *Id.* It required, in part, that such rules specifically establish:

(1) That the primary purpose of the programs shall be

victim safety and the safety of the children, if present.
(2) That the batterer shall be held accountable for acts
of domestic violence.
(3) That the programs shall be at least 29 weeks in
length and shall include 24 weekly sessions, plus ap-
propriate intake, assessment, and orientation pro-
gramming.
(4) That the program be a psychoeducational model
that employs a program content based on tactics of
power and control by one person over another.
(5) That the programs and those who are facilitators,
supervisors, and trainees be certified to provide these
programs through initial certification and that the
programs and personnel be annually monitored to
ensure that they are meeting specified standards.
*Id.*

In 2001, the regulatory authority under the law was moved
from the Department of Corrections to DCF. Ch. 2001-183, § 1, Fla.
Laws (2001). And in 2007, DCF promulgated its first rule. Fla. Ad-
min Code 65H-2.005 (repealed Mar. 21, 2013). The rule prescribed
mandatory program attributes and prohibited "content that in-
cludes faith-based ideology associated with a particular religion or
denomination." *Id.*

In 2012, the Florida Legislature repealed the certification and
monitoring program and stripped DCF of its regulatory function.
Ch. 2012-147, §§ 12-13, Fla. Laws (2012). For the next nine years,
BIPs no longer needed certification but remained subject to mini-
mum standards, including that they prioritize victim safety, hold

24-14082                Opinion of the Court                5

the batterer accountable, and use content based on a psychoeduca-
tional model addressing the tactics of power and control. *Id.* § 13.
In 2021, the Legislature reinstituted the certification and monitor-
ing program, again vesting DCF with rulemaking power. Ch. 2021-
152, §§ 3-5, Fla. Laws (2021). Finally, in 2022, DCF issued the regu-
lation at issue here (the "Regulation"):

> **65H-2.017 Program Curriculum.**
> (1) The program curriculum shall be based on a psy-
> choeducational or cognitive behavioral therapy inter-
> vention model that recognizes domestic violence and
> dating violence as the result of one person in an inti-
> mate relationship systematically using tactics of coer-
> cion, emotional abuse and physical violence in order
> to assert power and control over the other. The cur-
> riculum   shall   incorporate   the   following   ele-
> ments/content:
>> (a) An educational approach that assigns re-
>> sponsibility for the violence solely to the bat-
>> terer in taking responsibility for the violence.
>> (b) Encourages the batterer to develop critical
>> thinking skills that will allow the batterer to re-
>> think their behavior and identify behavior
>> choices other than violence,
>> (c) Addresses intimate partner violence as a
>> learned behavior, not an impulse control issue,
>> (d)  Domestic violence is not provoked or the
>> result of substance abuse and recognizes sub-
>> stance abuse patterns in domestic violence,
>> (e) – (k) [omitted]
> (2) The program curriculum *shall not* include the

following elements:
> (a) Couples, marriage or family therapy, or any manner of victim participation;
> (b) Anger management techniques that identify anger as the cause of domestic violence;
> (c) Theories or techniques that identify poor impulse control as the primary cause of the domestic violence or identify psychopathy on the part of either party as a primary cause of domestic violence;
> (d) Fair fighting techniques; or
> (e) *Faith-based ideology associated with a particular religion or denomination.*

Fla. Admin Code 65H-2.017 (2025) (emphasis added).

Dr. Joseph Wm. Nussbaumer, Jr. has provided services to hundreds of court-mandated participants as a BIP provider since the beginning of Florida's program. Dr. Nussbaumer was also a non-lawyer member of the Florida Bar Mental Health Committee, which recommended the creation of a BIP to the Florida Legislature. He holds a Doctor of Philosophy in Counseling Psychology from "Freedom University" and is licensed as a clinical Christian Psychologist by the Federal Association of Christian Counselors and Therapists, for which he serves on the board.

The parties do not agree when, if ever, Dr. Nussbaumer was "certified" or "authorized" to provide court-ordered BIP services. A representative from Appellee DCF testified that Dr. Nussbaumer applied for certification in 2002, but his "curriculum was rejected." DCF maintains that Dr. Nussbaumer was never certified. By

contrast, Dr. Nussbaumer asserts that he was "approved as a BIP provider" since 1995 and "continuously credentialed by the state of Florida" until the most recent regulation. When asked if he was ever "declined by DCF to be certified" or "not approved after an application," Dr. Nussbaumer stated, "Not until this situation that came up now."

But the record suggests otherwise. In a letter dated July 1, 2002, DCF informed Dr. Nussbaumer that his application was "initially denied" and provided its reasoning for denial. Dr. Nussbaumer acknowledged receipt. He wrote to DCF, explaining that "[m]any in our community service areas have asked us why they cannot send clients to us any longer" and that "[t]o be denied to continue serving the public, because we do not use a particular course of philosophy, I feel is an injustice to all concerned." Shortly thereafter, DCF again reviewed Dr. Nussbaumer's proposed curriculum and wrote that it was "unable to approve [his] request for certification" because his curriculum did "not meet the state minimum standards on program content." Finally, on November 19, 2003, Dr. Nussbaumer wrote to the state in a plea to secure a "religious exemption for faith-based organizations." Dr. Nussbaumer has been unable to provide proof of certification (or exemption therefrom) at any point between 1995 and 2012, when such certification was required by law.[3]

---

[3] In 2002, the law was amended to clarify that only DCF-certified BIPs could satisfy the probationary requirement for court-ordered participants. Ch. 2001-50, § 6, Fla. Laws (2001).

Certification notwithstanding, Dr. Nussbaumer claims he provided services to court-ordered participants for decades, starting "way back in 1990." He explains that he received referrals from courts and judges and that he saw clients with "no problems." It was not until DCF regained credentialing powers in 2022 that counties and probation officers began calling Dr. Nussbaumer, explaining they could not refer clients because he was not an approved provider. DCF refuses to approve Dr. Nussbaumer's program because it does not comply with the Regulation. Specifically, DCF takes issue with his faith-based approach and patient-specific counseling for anger management and substance abuse issues.

Dr. Nussbaumer sued DCF, claiming the Regulation was facially invalid under the First Amendment. The District Court granted DCF's motion for summary judgment because it determined that court-mandated BIPs constitute government speech, which is not subject to First Amendment scrutiny. Dr. Nussbaumer appeals.

## II. STANDARD OF REVIEW

We review *de novo* a district court's grant or denial of summary judgment, "drawing all inferences in the light most favorable to the non-moving party." *Smith v. Owens*, 848 F.3d 975, 978 (11th Cir. 2017). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III. DISCUSSION

The First Amendment provides, in part, that "Congress shall

make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech." U.S. Const. amend. I. The Supreme Court has long held that the Fourteenth Amendment incorporates First Amendment protections against the States. *See*, *e.g.*, *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S. Ct. 900, 903 (1940).

Dr. Nussbaumer claims the Regulation violates his First Amendment rights under the Free Speech and Free Exercise Clauses. He seeks to have the Regulation declared unconstitutional and have DCF permanently enjoined from enforcing it. The claims under each Clause overlap, and the two Clauses often work in tandem. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523, 142 S. Ct. 2407, 2421 (2022) ("These Clauses work in tandem. Where the Free Exercise Clause protects religious exercises, whether communicative or not, the Free Speech Clause provides overlapping protection for expressive religious activities."). However, to be precise, we address each claim in turn.

## A. Free Speech

At its core, the "First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S. Ct. 2286, 2290 (1972). At the same time, a "government entity has the right to speak for itself." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467, 129 S. Ct. 1125, 1131 (2009) (quoting *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 592 U.S. 217, 229, 120 S. Ct. 1346, 1354 (2000) (internal quotation marks

omitted)).

"The Free Speech Clause restricts government regulation of private speech; it *does not regulate government speech*." *Id.* (emphasis added). Where the government speaks, "the Free Speech Clause has no application." *Id.*; *see also Johanns v. Livestock Mktg. Assn.*, 544 U.S. 550, 553, 125 S. Ct. 2055, 2058 (2005) ("[T]he Government's own speech . . . is exempt from First Amendment scrutiny."). Delineating between government and private speech, then, becomes dispositive of whether a Free Speech claim can progress.

The government can speak directly through its own members, but a government may still "exercise this same freedom to express its views when it receives assistance from private sources for the purpose of delivering a government-controlled message." *Summum*, 555 U.S. at 468. Assessing the boundary between government speech and government-regulated private speech requires a holistic, context-specific inquiry and should not be "mechanical." *Shurtleff v. City of* Boston, 596 U.S. 243, 252, 142 S. Ct. 1583, 1589 (2022).

Several recent cases, both at the Supreme Court and in our Circuit, guide our analysis. In *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, the Supreme Court held that messages displayed on license plates are government speech, so the Sons of Confederate Veterans could not force Texas to issue plates depicting a Confederate battle flag. 576 U.S. 200, 219, 135 S. Ct. 2239, 2253

24-14082                Opinion of the Court                11

(2015).[4] In *Mech v. School Board of Palm Beach County*, we found that a program allowing school sponsors to hang banners on school property was government speech. 806 F.3d 1070, 1072 (11th Cir. 2015). Most recently, in *Cambridge Christian School, Inc. v. Florida High School Athletic Association, Inc.*, we held that the Florida High School Athletic Association ("FHSAA") could deny a religious school the opportunity to lead a pregame prayer over the public address ("PA") system at the state championship because that particular use of the PA system was government speech. 115 F.4th 1266, 1288 (11th Cir. 2024), *petition for cert. filed*, (U.S. June 6, 2025) (No. 24-1261).

On the other hand, the Supreme Court found that a flagpole outside of Boston City Hall, often utilized by event hosts, was *not* a medium for government speech because of the "city's lack of meaningful involvement in the selection of flags or the crafting of their messages." *Shurtleff*, 596 U.S. at 258. And in *Matal v. Tam*, the Court summarily rejected the idea that the Lanham Act's trademark registration regime turned trademarks into government speech. 582 U.S. 218, 239, 137 S. Ct. 1744, 1760 (2017).

While there is no precise test, courts consistently look to three factors: "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is

---

[4] In *Leake v. Drinkard*, we held that the same Sons of Confederate veterans could not force the City of Alpharetta, Georgia, to permit the Confederate flag to be flown at the city-funded, pro-veterans parade. 14 F.4th 1242, 1245 (11th Cir. 2021).

speaking; and the extent to which the government has actively shaped or controlled the expression." *Shurtleff*, 596 U.S. at 244; *see also Cambridge Christian Sch., Inc.*, 115 F.4th at 1288. We begin with the history.

### 1. History

"The first factor—history—directs us to ask whether the type of speech under scrutiny has traditionally 'communicated messages' on behalf of the government." *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 924 F.3d 1215, 1232 (11th Cir. 2019) (quoting *Walker*, 576 U.S. at 211). "A medium that has long communicated government messages is more likely to be government speech, but a long historical pedigree is not a prerequisite for government speech." *Mech*, 806 F.3d at 1075-76 (internal citations omitted).

Dr. Nussbaumer asks this Court to use a "30,000-foot view," and examine whether "speech between a therapist and their patients" has historically been used to communicate messages on behalf of the government. He argues it has not. But the appropriate historical inquiry must be narrowly tailored to that of the speech under regulation. For example, in *Cambridge Christian School, Inc*, we examined the history of pregame private use of the PA system at FHSAA championship football games. 115 F.4th at 1289. We declined to consider *non-championship* pregame PA use because only championship games were hosted at a neutral site in partnership with the FHSAA. *Id.*

The appropriate historical scope here is that of court-

24-14082              Opinion of the Court              13

ordered BIPs—not that of therapists and their patients. As a threshold matter, court-ordered BIPs are not therapy or treatment; they are instructional programming. *See* Fla. Stat. § 741.32 (2024). Moreover, DCF does not purport to regulate voluntary BIPs or therapy sessions. In their brief, DCF explains that those who "voluntarily attend BIP may do so with a program that has not been certified," and "[a]s a provider to those folks, Appellant may use any method he chooses to educate those participants."

Focusing on the history of Florida's court-ordered programs, we find they have consistently been used to convey a government message. From the very beginning, the stated mission of Florida's law was to provide "standardized programming . . . to protect victims and their children and to hold the perpetrators of domestic violence accountable for their acts." Ch. 95-195, § 16, Fla. Laws (1995). Dr. Nussbaumer points out that certification has not always been required, and that for much of the program history "the State has no evidence it used the BIP certification to communicate any particular message." But while certification requirements have varied, the core BIP message was always mandated by statute. For example, from 2012 to 2021, BIPs still had to follow a psychoeducational model, address the "tactics of power and control," be twenty-nine weeks in length, and hold the batterer exclusively accountable. Ch. 2012-147, §§ 13, Fla. Laws (2012).

It is possible the State could hold such a poor grip on its message that it begins speaking in contradictions and ultimately communicates nothing at all. *See Matal*, 582 U.S. at 236 (explaining that

the government could not be speaking through the trademark registration process, because if it were, it would be "babbling prodigiously and incoherently"). But the record does not support this finding, and control is discussed at greater length in factor three.

Sending a government message is the *raison d'être* for court-ordered domestic violence programming. Florida has a wheelhouse of correctional devices it could employ. But it chooses to require attendance at courses with specific content that *it* believes should be communicated to counter domestic violence. And it has sent that message for decades. Accordingly, we hold that Florida's court-ordered BIPs have traditionally communicated the government's message.

### 2. Endorsement

The second factor asks whether the public would likely associate the speech with the government or "reasonably believe the government has endorsed the message." *Mech*, 806 F.3d at 1076. "The fact that private parties take part in the design and propagation of a message does not extinguish the governmental nature of the message or transform the government's role into that of a mere forum provider." *Walker*, 576 U.S. at 202.

In *Walker*, the Court held that license plate designs are likely seen as state-backed because they serve a public purpose, are exclusively issued by the state, and must be displayed under law. *Id.* at 212. By contrast, in *Shurtleff*, the Court found the public would not necessarily assume Boston endorsed a flag near city hall. 596 U.S. at 255. It explained that the flagpole was freely used by event

planners to display private messages, and observers could easily see affiliated eventgoers gathering below it. *Id.*

Here, we ask whether a court-ordered participant would reasonably believe the state has endorsed a BIP curriculum. We think they would. As in *Walker*, BIPs serve a government purpose and are mandated by law. *See* 576 U.S. at 202. Dr. Nussbaumer asserts that voluntary participants would not believe the government is speaking to them. But again, Dr. Nussbaumer is suing for the right to offer his BIP to *court-ordered* participants; DCF does not challenge his ability to see voluntary individuals. This case is unlike *Shurtleff* because, there, Bostonians were not ordered to look at the flag, and the city had no criteria defining acceptable flags. *See* 596 U.S. at 255.

Dr. Nussbaumer also argues that participants identify his programming with him and not with the government because they can choose from a variety of providers. But these perceptions are not mutually exclusive; one can associate the speech with Dr. Nussbaumer *and* the State, which has mandated course attendance and stipulated its essential content. Our precedent has found government speech even where the speech is endorsed by another participating party. *See, e.g., Leake v. Drinkard*, 14 F.4th 1242, 1249 (11th Cir. 2021) (finding government speech where the City of Alpharetta, Georgia and the sponsor of a parade "came together to endorse the *same* message"). While individuals have a selection of providers, they are told—at least under current law—that they may only choose from programs that are credentialed by the state. *See*

Ch. 2021-152, §§ 3-5, Fla. Laws (2021). And if they ever wonder "why am I here?," the obvious answer is "because the government made me go." Accordingly, we find that a court-ordered participant would identify BIP curricula with the government, even if they also identify it with a specific BIP provider.

### 3. Control

Lastly, we ask whether the government has "shaped or controlled the expression" at issue. *Shurtleff*, 596 U.S. at 252. We focus specifically on the State's control over "content and meaning," rather than logistics. *Id.* at 256 (deemphasizing Boston's scheduling and administrative role, instead focusing on the city's lack of "control over the flags' content and meaning") The "government-speech doctrine does not require omnipotence," and the "government need not 'control every word or aspect of speech in order for the control factor to lean toward government speech.'" *Leake*, 14 F.4th at 1250 (quoting *Cambridge Christian Sch., Inc.*, 924 F.3d at 1235-36).

As described above, regulatory certification and monitoring of BIPs varied over time, but minimum standards for BIP content have always existed. Dr. Nussbaumer contends that, because the government does not "affirmatively create" the curricula, it is not government speech. But this belies our precedent. In *Walker*, the Court held that license plates created by the public were under the government's domain because Texas had final approval over the messages. *Walker*, 576 U.S. at 213. Similarly, in *Mech*, we held that banners created by school sponsors were controlled by the

government because the principal reserved discretion to approve all banners, and the school had criteria limiting what banners could contain. 806 F.3d at 1078. Here, as in each of those cases, the government has circumscribed the message it is willing to send and DCF holds discretion to reject nonconforming applicants.

Next, Dr. Nussbaumer argues the government lacks control because it could not produce documents showing it had rejected any curriculum other than his since the Regulation was implemented. But this does not mean that it approved noncompliant curricula. Indeed, the record shows that DCF was consistently willing to assist Dr. Nussbaumer to come into compliance so he could be certified. In response to his application, DCF listed specific deficiencies and offered to "schedule a phone conversation," even offering to "accommodate any scheduling issues that might be involved."

Finally, Dr. Nussbaumer claims the state failed to uphold its standards because he, despite lacking certification, managed to see court-ordered participants for decades. To this point, a representative from DCF said it believed Dr. Nussbaumer was providing services while he was unaccredited, though they did not "know for a fact." Reading the record in the light most favorable to Dr. Nussbaumer, we presume he was. But DCF did try to stop him. It rejected his application twice; once in 2002 and once in 2022. And Dr. Nussbaumer acknowledged each rejection in writing. We do not find that Dr. Nussbaumer's ability to skirt DCF's authority outweighs its broader reign of the state-wide program.

### 4. Weight of the Factors

The three factors are "neither individually nor jointly necessary for speech to constitute government speech." *Leake*, 14 F.4th at 1248. "But a finding that *all* evidence government speech will almost always result in a finding that the speech is that of the government." *Id.* Here, we find that court-ordered BIPs are government speech because all factors decisively weigh in favor of DCF. And, of course, a government is "entitled to say what it wishes, and to select the views that it wants to express." *Summum*, 555 U.S. at 467-68. (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833, 115 S. Ct. 2510, 2519 (1995) (internal quotation marks omitted)). Therefore, we agree with the District Court that Dr. Nussbaumer's Free Speech claim cannot proceed.

### B. Free Exercise

"The [Free Exercise] Clause protects not only the right to harbor religious beliefs inwardly and secretly. It does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of (or abstention from) physical acts." *Kennedy*, 597 U.S. at 524 (quoting *Emp. Div., Dept. of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 877, 110 S. Ct. 1595, 1599 (1990) (internal quotation marks omitted)).

But as we held in *Cambridge Christian School, Inc.*, "the government's own speech cannot support a claim that the government has interfered with a private individual's free exercise rights." 115 F.4th at 1296. "The Free Exercise Clause simply cannot be

understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens." *Bowen v. Roy*, 476 U.S. 693, 699, 106 S. Ct. 2147, 2152 (1986); *see also Sherbert v. Verner*, 374 U.S. 398, 412, 83 S. Ct. 1790, 1798 (1963) (Douglas, J., concurring) ("For the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government."). Dr. Nussbaumer's Free Exercise claim, then, must also fail.

### C. Facial Challenges

The remedy sought in District Court and on appeal is a permanent injunction enjoining DCF from enforcing the Rule in all contexts and against all parties. Dr. Nussbaumer asserts that the Regulation is "unconstitutional on its face." The question presented in Dr. Nussbaumer's brief, however, asks only whether DCF violated *his* Free Speech and *his* Free Exercise rights. His complaint similarly makes no mention of harm to other parties.

In *Moody v. NetChoice, LLC*, the Supreme Court made clear that facial challenges must examine "a law's full set of applications, evaluate which are constitutional and which are not, and compare one to the other." 603 U.S. 707, 718. 144 S. Ct. 2383, 2394 (2024). "Even in the First Amendment context, facial challenges are disfavored, and neither parties nor courts can disregard the requisite inquiry into how a law works in all of its applications." *Id.* at 744. In seeking a facial review while demonstrating only his own alleged

grievance, Dr. Nussbaumer disregarded this inquiry.[5] Because we hold the law applies exclusively to government speech, though, we need not evaluate its range of applications.

### IV. CONCLUSION

This case asks whether a service provider, who seeks the privilege to work with court-ordered participants, can use the First Amendment as a sword to morph the government's message into his own. He cannot. We conclude that the curriculum and presentation of court-ordered BIPs are government speech. For this reason, Dr. Nussbaumer cannot sustain a claim under the Free Speech or Free Exercise Clause of the First Amendment. We affirm the District Court.

**AFFIRMED.**

---

[5] Moreover, injunctive relief may not exceed what is "broader than necessary to provide complete relief to each plaintiff." *Trump v. Casa*, 145 S. Ct. 2540, 2562-2563 (2025). Anything further may "exceed the equitable authority that Congress has granted to federal courts. *Id.* at 2548. Dr. Nussbaumer has not explained why an injunction barring enforcement against all parties, an extraordinary remedy, would be appropriate here.